DUROY & LE MAISTRE, INC., Respondent, v. FRANK GILLMORE, as President of ACTORS' EQUITY ASSOCIATION, an Unincorporated Association of More Than Seven Members, Appellant.

First Department, December 27, 1935.

*John Schulman* of counsel [*Paul N. Turner, Rebecca Brownstein* and *Morris Shilensky* with him on the brief; *Paul N. Turner*, attorney], for the appellant.

*Edwin J. Lukas* of counsel [*Sapinsley & Lukas*, attorneys], for the respondent.

GLENNON, J.   The defendant has appealed from a judgment in the sum of $13,358.14 entered after a trial before a court and jury. The verdict as rendered originally was in the sum of $40,000, but, on motion, it was reduced without objection on the part of the plaintiff.

The cause of action was based upon the theory that the Actors' Equity Association had maliciously, willfully, intentionally and wrongfully, and without just cause or excuse, induced, enticed and persuaded certain actors and actresses to leave the employ of the plaintiff, to break their contracts and to refuse to continue to perform and appear in a play which bore the title " Right of Happiness," at performances scheduled for Saturday afternoon and evening of April 11, 1931.

At the close of the plaintiff's case, and again at the close of the whole case, the court reserved its decision on a motion to dismiss the complaint.   After the verdict was rendered, the court denied the motion to dismiss.   In so doing we believe that the court fell into error.   A brief *résumé* of the facts out of which this litigation grew will be set forth for the purpose of showing why we have reached this conclusion.

The defendant Actors' Equity Association was organized to protect the actor in his relations with managers or producers in their working conditions.   About ninety-five per cent of those employed as actors and actresses in the " legitimate " and musical comedy theatres in the United States are members of the association.   It is affiliated with the American Federation of Labor, having received its charter in 1919.

The plaintiff was organized to produce plays.   Its president, Robert DuRoy, dominated and controlled its affairs.   DuRoy is by occupation a playwright and actor.   He was the author, and a member of the cast of the " Right of Happiness."   In addition thereto, he has been a member of the defendant association since about 1925.   As a result thereof he had at least some familiarity with the purpose and rules of the Actors' Equity Association.

The plaintiff, as manager, entered into a contract with Miss Anne Sutherland, a well-known actress, on the 17th of March, 1931, wherein and whereby it agreed to pay her the sum of $175 on Saturday of each week from and after the date of the first public performance.   Similar contracts were entered into between the plaintiff and the other members of the cast.   In each case the standard form issued by the Actors' Equity Association was used. The contract contained among others the following paragraph:

" 5. The Manager agrees that he has notice that the Actor herein is a member of Equity and as such is bound to conform to its law-

ful rules and regulations, and that it is a lawful rule and regulation of said association that, as far as the Manager herein is concerned, the Actor is to work only in companies operated by the Manager herein, when, (1) all members of said company or companies are members of Equity and/or Chorus Equity in good standing and continue to be such during the term hereof, and, (2) while the Manager has fully performed and is fully performing the covenants in each employment contract with each Equity and/or Chorus Equity Actor in each of said companies; and the Manager agrees that the Actor is not and shall not be required to work hereunder in violation of said rule or other lawful rule of said association, and that to the full extent to which this agreement is lawful, all actors in the company in which the Actor is employed shall be and shall continue throughout the term hereof (except as provided in paragraph 36 of the Rules) members of good standing of Equity and/or Chorus Equity."

It might also be noted that under the regulations the actor agreed to rehearse without pay for several weeks before the first performance.

The play opened on April 2, 1931, after rehearsals covering a period of about three weeks. Apparently, it was doomed from the outset. The gross receipts from the sale of tickets covering the four performances during the first week amounted to only $1,085.85. The theatre had a seating capacity of about 900, and the average price of the tickets was two dollars The minimum rent was $2,000 per week, and the salaries provided for in the contract amounted to $1,310 per week.

At the end of the evening performance on Saturday, April fourth, DuRoy called a meeting of the cast. He informed them in substance that he did not have sufficient money to pay them. He said in part: " In order for me to continue with the production, I would have to have the consent of each and every member of that company to play through with me the following Saturday night." After conferring among themselves, he asserts that Miss Sutherland said in part: " ' Bob, we have all agreed to play ball with you. * * * I realize we have put a lot of work in it. We believe in the play now just as much as we did before, and if it will mean that we might get something out of this play, we are ready to play with you through that Saturday night performance of the following week, and not make any demands on salary,' " and further: " I thanked every one of them, and as we were leaving the stage, Miss Sutherland came over to me. She said ' How about the picture rights to this play? ' I said ' I don't know what you mean.' She said ' Would you be willing to give me a percentage of the picture

rights if we play along with you?' I said 'Miss Sutherland, you have agreed to play with me; if, on the following Saturday night after the performance, I am not able to fully meet the salaries, I will be very happy to go with you to Equity, and see that the matter of the picture rights is apportioned to each and every member of the cast. I will make no exceptions with anyone.'" Miss Sutherland gave a different version. She said: "And at the end of the conversation I said to Mr. DuRoy — not on one side — I said that I would go on, on one condition, and that was that he would go over to Equity and see them about drawing up some sort of a form where the company would be given a certain amount of the money, if he sold it for the moving picture rights."

During the following week there was a considerable falling off in the attendance. Although six performances had been given, the box office receipts amounted to only $1,085.85. It was quite apparent at that time that plaintiff could not pay the salaries of the cast for the two weeks and also the weekly rental. On Friday evening, April tenth, Miss Sutherland received defendant's Exhibit " B " which reads as follows: " I personally guarantee Anne Sutherland 2 weeks' salary. Robert DuRoy." According to DuRoy this paper was delivered because the night before Miss Sutherland had complained that her salary had not been paid. On the other hand, she contended that the so-called guaranty was delivered to her pursuant to an arrangement which was made when she refused to sign a communication addressed to the Actors' Equity Association, wherein several of the members of the cast agreed not to hold Equity responsible for any defaults in payment by the manager under the contract. It might be noted, in passing, that it was conceded by the plaintiff that a producer who puts on a play is ordinarily required to furnish a bond to the defendant association to secure the salaries of the actors.

In any event, it is not disputed that Miss Sutherland was dissatisfied because of the failure of the plaintiff to pay her any salary when she visited the office of the defendant on the morning of April eleventh. What she stated to Mr. Dullzell, the executive secretary and treasurer of the defendant, does not appear, since, upon objection by plaintiff, the testimony was excluded. However; after her talk two employees of the defendant accompanied Miss Sutherland to the theatre. The directions they were given by the executive secretary were also excluded.

We have conflicting versions of what happened in the afternoon of April eleventh at the theatre. It is fair to say that a demand was made for Miss Sutherland's back salary. That the representatives of the defendant were well within their rights in going to the

theatre is evidenced by subdivision " R " of the regulations, which is a part of the contract.   It reads: " Deputies of Actors' Equity Association will be permitted in each company and the duly authorized representative of said Association shall have free access to the stage and to all members of said Association at all times and said Association may represent its members in any dispute which may arise with the manager."

During the course of the conversation which took place at that time DuRoy informed the representatives of the defendant that the members of the cast had orally agreed on April fourth to wait for their back salary until Saturday, April eleventh.   According to him one of the representatives, a Mr. O'Neill, said in part: " I am not interested in you or what you have to say.   You either pay Miss Sutherland right now or your curtain does not go up."   O'Neill's version was, " I asked him if he would give me an order on the box office for the amount due Miss Sutherland for salary, or an order or a guarantee from Joe Leblang, who was then alive and a ticket broker.   He could not do either."

It was conceded by Mr. Mufson, the other representative who was present, that he informed Miss Ruth Holden, one of the actresses who was the Equity deputy for that company, that she was to instruct the entire company that inasmuch as Miss Sutherland had not been paid her salary due April fourth, there would be no performance, and to notify the members to that effect.   It must be borne in mind that all the cast were members of the Actors' Equity Association and bound by its rules and regulations.

It is not asserted by DuRoy that he submitted a proposed change as to the due date of the payment of salary to Equity for its approval by a duly authorized representative.   Subdivision " T " of the regulations provides:

" T. Unless any and all riders, changes or alterations of this printed form shall have been consented to by Equity such riders, changes or alterations, or any part thereof, are void, at the option of the actor (Equity consenting).   It shall be the duty of the manager, not of the actor, to submit proposed changes to Equity for its approval by a duly authorized representative."

Apparently with that provision in mind, he sought to circumvent it by stating that Miss Sutherland promised that she would go to Equity and make known the facts.   He quoted her as saying in reply to his question, " Did you make everything clear to the officials, or whoever it is necessary?   *   *   *   ' Yes, I spoke to them, and everything is all right.' "   Miss Sutherland vehemently denied that she had done so or even had promised DuRoy that she would.   There is nothing in the record to show that she did in fact

notify the defendant. There is no evidence to indicate that Equity ever had knowledge of the so-called modification, or that it consented to any changes or alterations in the contract. Since the plaintiff did not submit the proposed changes to Equity for its approval by a duly authorized representative it did not comply with the terms of regulation " T " as quoted.

We believe that the evidence falls far short of indicating that the Actors' Equity Association maliciously, willfully, intentionally and wrongfully, and without just cause or excuse, induced, enticed and persuaded the actors and actresses to break their contracts, and to refuse to continue to perform. In *Campbell* v. *Gates* (236 N. Y. 457) Judge McLaughlin said: " The great weight of authority in this country and in England is to the effect that if A has a legal contract with B, either for the rendition of service or any other purpose, and C, having knowledge of the existence thereof, intentionally and knowingly and without reasonable justification or excuse induces B to break the contract, by reason of which A sustains damage, an action will lie by A against C to recover the same. [See authorities cited in *Lamb* v. *Cheney & Son*, 227 N. Y. 418.] The action of C is malicious in that with the knowledge of A's rights, he intentionally and knowingly and for unworthy or selfish purposes, destroys them by inducing B to break his contract. It is a wrongful act, done intentionally, without just cause or excuse, and from this a malicious motive is to be inferred. This does not necessarily mean actual malice or ill-will, but the intentional doing of a wrongful act without legal or social justification. The action is predicated not on the intent to injure, but on the intentional interference, without justification, with A's contractual rights, with knowledge thereof. It is a legal wrong and one who commits it, if damage be sustained, must answer therefor." In *Hornstein* v. *Podwitz* (254 N. Y. 443, at p. 448) Judge Hubbs summed up the rule which applies, in one sentence: " The action is predicated on the intentional interference without justification with contractual rights, with knowledge thereof."

The only purpose this defendant had in sending its representative to the theatre was to try to collect for Miss Sutherland the salary which fell due on April fourth. If plaintiff had paid her, this litigation would have been avoided. The contract, as we have seen, provided that the defendant had the right to represent Miss Sutherland in the dispute which she had with the plaintiff concerning her salary.

In so far as this plaintiff was concerned, it cannot assert with any show of right that there was any consideration for the promise of the actors to waive their rights to the payment of the salary which was due on April fourth. ( *Kellogg* v. *Olmsted*, 25 N. Y. 189.)

We have, therefore, the rather unusual situation where the plaintiff, which breached its employment contracts with Miss Sutherland and the other members of its cast, has been permitted to have a recovery for expenditures made in connection with a play which did not attract the public, on the theory that this defendant maliciously, intentionally, knowingly, and without justification, interfered with the performance of those very same contracts. We do not believe that such a recovery is just or proper, and consequently we have determined that it should not be permitted to stand.

While we do not know what effect the testimony which the defendant sought to offer with reference to the information Miss Sutherland gave to Mr. Dullzell, the executive secretary, might have had upon the minds of the court and jury, still, we are of the opinion that in this type of case where the question of intent upon the part of the defendant was highly important, it would have been competent to show the good faith of the defendant in sending its representatives over to the theatre to act in Miss Sutherland's behalf. While we have not been referred to any authorities where this question has been discussed in cases involving a malicious interference with contracts, still in those of a similar nature where the intent of the parties' act is deemed to be relevant, testimony of like import has been allowed. (*McKown* v. *Hunter*, 30 N. Y. 625; *Heyne* v. *Blair*, 62 id. 19; *Noonan* v. *Luther*, 206 id. 105; *Davis* v. *Marvine*, 160 id. 269; *Taylor* v. *Manning*, 190 App. Div. 559; *People* v. *Dowling*, 84 N. Y. 478; *Beach* v. *Bemis*, 107 Mass. 498.)

We are further of the opinion that the court erred in excluding the testimony of Mr. Dullzell as to the instructions he gave to Messrs. O'Neill and Mufson before they left the office of Equity on Saturday, April eleventh. This evidence might well have shown that these employees, if they were guilty of any wrong, were not acting within the scope of their employment. (*Psota* v. *Long Island R. R. Co.*, 246 N. Y. 388; *O'Brien* v. *Stern Brothers*, 223 id. 290; *Reilly* v. *Connable*, 214 id. 586.)

For the reasons assigned herein, the judgment should be reversed, with costs, and the complaint dismissed, with costs.

MARTIN, P. J., TOWNLEY and UNTERMYER, JJ., concur; MERRELL, J., dissents and votes for affirmance.

MERRELL, J. (dissenting). Plaintiff is a domestic corporation organized by a man by the name of Roy Davidson, who, throughout the trial and the record, appears under the name of Robert DuRoy. The plaintiff corporation was organized for the purpose of producing a drama, of which Robert DuRoy was the author, and known as "Right of Happiness." The defendant is sued as president of

Actors' Equity Association, an unincorporated association of more than seven members. Actors' Equity Association is a non-profit making organization, and is a union affiliated with the American Federation of Labor, its avowed purpose being to protect actors in their relations with managers and producers. The evidence shows that DuRoy, in writing the play "Right of Happiness," consumed approximately two years. DuRoy was the promoter and is president of the plaintiff corporation, and is himself practically identical with the plaintiff corporation. For the purpose of producing this play, DuRoy first entered into a contract whereby the Vanderbilt Theatre in New York city was leased at a rental of $2,000 per week. Plaintiff engaged a cast of ten members, all of whom were members of Actors' Equity Association, with the exception of a pianist engaged in producing the play. The play went into rehearsal for some three weeks in March, 1931. The premier performance of the play occurred on April second at the Vanderbilt Theatre. Each of the ten members of the cast entered into a written contract with the plaintiff using a form known as "Equity Minimum Contract. Standard Form issued by the Actors' Equity Association." The contracts of the several members of the cast were identical, except as to salaries for different parts in the play. The contract contains the following clause: "Employment hereunder shall begin on the date of the beginning of rehearsals, and shall *continue* until terminated by notice given as herein provided *and not otherwise.*" (Italics are the writer's.)

The date of the premier performance, April 2, 1931, was on Thursday, the day before Good Friday. Concededly, the season when this play began performances was inopportune, and most theatres run at a loss during the week before Easter. However, performances of the play were given on Thursday, Friday and Saturday nights. According to the testimony of plaintiff's president, after the performance was closed on Saturday evening, April fourth, plaintiff's president summoned the members of the cast to go upon the stage, at which time he told them that he was unable to pay them their salaries which were due at that time for the previous performances of the play, and that he had but $1,080 available from the receipts of the play, and that he must pay on the following Monday $1,000 rental to the theatre. He told them if they would consent to postpone the payment of their various salaries until Saturday night of the following week, he would be in a position to pay them and would pay them their salaries for the two weeks. He also stated that he personally would forego his salary of $150 a week, he himself being a member of the cast, in case the receipts were insufficient to pay the salaries of the other members of the cast

in full on the following Saturday night. After making such statements, the various members of the cast asked him to retire, and they conferred together. In a few moments he was summoned back and Miss Anne Sutherland, the leading lady, acting as spokesman for the members of the cast, said to him, addressing the plaintiff's president: " Bob, we have all agreed to play ball with you. I realize we have put a lot of work in it. We believe in the play now just as much as we did before, and if it will mean that we might get something out of this play, we are ready to play with you through that Saturday night performance of the following week, and not make any demands on salary." Plaintiff's president testified that he then thanked the members of the troupe, and that after the agreement had been made some inquiry was made by Miss Sutherland as to the picture rights of the play, and she asked plaintiff's president: " Would you be willing to give me a percentage of the picture rights if we play along with you? " Plaintiff's president testified that in reply he said: " Miss Sutherland, you have agreed to play with me; if, on the following Saturday night after the performance, I am not able to fully meet the salaries, I will be very happy to go with you to Equity, and see that the matter of the picture rights is apportioned to each and every member of the cast. I will make no exceptions with anyone." Right there the evidence presented a sharp question of fact. The testimony of Miss Sutherland was to the effect that the agreement to postpone the demand for the salaries until the following Saturday was conditioned upon the turning over of the picture rights at once, whereas, the plaintiff's president testified that the picture rights were an after consideration, and that he voluntarily made the agreement to secure the payment of the salaries in case the production did not bring enough money the following week to pay such salaries. The jury evidently, by its verdict, credited the testimony of plaintiff's president in this respect. The play went on the following Monday, Tuesday, two performances on Wednesday, and performances on the nights of Thursday and Friday. There were to be two performances on Saturday, one a matinee at two-forty in the afternoon and the other the usual evening performance. Plaintiff's president testified that he went to the theatre about two o'clock and prepared to take part in the matinee. He said the other members of the cast were all present, including Miss Sutherland, and were all dressed, ready to open the performance; that Miss Sutherland, at the time, was made up and dressed for her appearance in the first scene of the play; that, as he was awaiting the raising of the curtain, a knock came at his door and there appeared a man by the name of Mufson, who stated that he came, representing the Actors' Equity Associa-

tion, to demand the salary due to Miss Sutherland. Soon after another representative of the Actors' Equity Association, a man by the name of O'Neill, appeared. The plaintiff's president testified that he then told Mufson and O'Neill that there was no salary due to Miss Sutherland at that time, and that there had been an oral modification of the contract whereby the actors and actresses of the cast had waived the payment of the salaries until the present Saturday night, when they would be paid in full; that Mufson then stated he knew nothing about any such contract or modification, and that DuRoy then explained to him and to O'Neill just what had occurred after the night performance on April fourth. The man Mufson was described by defendant's witness Paul Dullzell, secretary of the defendant association, as follows: " He had several duties. He was an assistant to Mr. Moore [Bonding Dept.] and he was also assisting in the legal department, *as well as general duties of the affairs of the Association.*" (Italics are the writer's.) DuRoy testified that, when Mufson demanded the payment of Miss Sutherland's salary, he told him that, in view of the agreement which had taken place on the prior Saturday night of April fourth, which he detailed to Mufson, neither Miss Sutherland nor any other member of the cast was then and there entitled to any salary, but that they would receive their full salary at the end of the night performance of that day. According to the testimony of Dullzell, secretary of the Actors' Equity Association, the duties of the man O'Neill were as follows: " His duties as a representative of the Association [Equity] were to see that the conditions of the contracts were observed, to advise Equity members." It is a matter of some significance that two men were dispatched by the Association to collect the salary due to Miss Sutherland. A very lame excuse was offered by Dullzell for sending two members, in response to an inquiry by the justice who presided at the trial. DuRoy testified that he fully explained to Mufson and O'Neill all that had transpired on the stage of the theatre on the night of April fourth, and that when he told the representative of the Actors' Equity Association that he did not know why other members of the cast who were also members of the Actors' Equity Association should not also be considered and permitted to play in accordance with the agreement, O'Neill replied: " I am not interested in anybody else in the company but Miss Sutherland." DuRoy testified that he then told Mufson and O'Neill that his entire capital and savings were invested in the production, and that he had interested capital, a representative of which was to be present at that afternoon's performance, and that, unless the performance was given, they would kill every chance he had to go on with the play; that in reply Mufson stated: " I

am not interested in you or what you have to say. You either pay Miss Sutherland right now *or your curtain does not go up.*" (Italics are the writer's.) The other members of the cast were unable to understand why the performance did not go on, and, in Mufson's presence, DuRoy testified that he explained to the members what had just transpired, and that the other members of the cast insisted that Miss Sutherland was not entitled to her salary any more than they. DuRoy testified that he called upon Miss Sutherland in her dressing room and had a conversation with her, in which he said to her:

" Anne, you are an old trouper. You know a great deal more about the theatre and these things than I do. Why did you do this? She answered me that she did not know it would come to anything like this. She just innocently went into Equity to see what could be done about getting her salary, and asked this man to come down and talk to me. She did not tell him to come down and close the play. I said, ' Well Anne, there is no hard feeling between you and I. We are both in the business.' She said, ' Now listen, Bob, I am ready and willing to go on.' * * * I said, ' Miss Sutherland, you are taking the wardrobe which belongs to the production,' and she said to me that she was ordered by Mr. Mufson to take her clothing away with her."

The physical facts certainly support the testimony of plaintiff's president. There is no question, under the testimony, but what Miss Sutherland was ready to proceed with the play, nor is there any doubt that she was not directly responsible for the discontinuance of the play. An understudy for Miss Sutherland, a Miss Talbot, was present, and plaintiff's president then asked that the play proceed with the understudy, but that Mufson replied that if Miss Sutherland did not go on the curtain would not go up. It seems to me there was no reasonable excuse for the arbitrary and dictatorial methods thus pursued by the representatives of the defendant association. Ironically, the largest audience that the play to that time enjoyed was already gathered in the theatre for the matinee performance of Saturday, April eleventh. The house was more than half-filled, and the receipts would have been at least $900 for that performance. Not only did Mufson state that the play was not going on, but he directed the other members of the cast to take their clothing and get out.

The appellant attacks the modification of the contract claimed by respondent as without consideration. Under well-settled principles of law, contracting parties may postpone the time of payment or the time of performance designated in a written instrument without any new consideration. (*General Supply & Const. Co.* v.

*Goelet*, 241 N. Y. 28, 34; *Deeves & Son* v. *Manhattan Life Ins. Co.*, 195 id. 324, 330; *Arnot* v. *Union Salt Co.*, 186 id. 501, 511; *Toplitz* v. *Bauer*, 161 id. 325, 333; *Thomson* v. *Poor*, 147 id. 402, 409; *Livingston* v. *Klaw*, 137 App. Div. 639, 640.) The agreement entered into between the plaintiff and the various actors in the cast on the evening of April fourth was no more than a waiver on the part of the members of the cast of the time of payment of their salaries for the week ending that night. They also waived whatever default the plaintiff committed in the failure to pay such salaries. The postponement of the time of payment of salaries to the conclusion of the Saturday night performance on April eleventh was evidenced by their united oral waiver to that effect, and by their remaining in plaintiff's employ and continuing, without objection or demand of their salaries, to work during the following week. In the case of *Arnot* v. *Union Salt Co.* (186 N. Y. 501, 511) the Court of Appeals puts at rest the contention of the appellant that there was no consideration for the modification of the contract. The Court of Appeals in that case said: " Where a party entitled to enforce payment under a contract has consented to postpone the time of such payment, and the other party has acted upon such consent and in reliance thereon has permitted the contract time to pass without payment, the creditor may not treat the failure to pay within the time originally specified as a breach of the contract. (*Thomson* v. *Poor*, 147 N. Y. 402, 409.) No new consideration is required to support a waiver of payment upon a specified date (*Toplitz* v. *Bauer*, 161 N. Y. 325, 333), and the party who has thus waived strict payment cannot consider the other party in default unless he gives notice that he has withdrawn his waiver before the time for payment has arrived. (*Thomson* v. *Poor, supra.*)" Likewise, in *Toplitz* v. *Bauer* (161 N. Y. 325) the Court of Appeals said (at p. 333): " Strict performance in such cases may be waived by any agreement, declaration or course of conduct on the part of the pledgee which leads the owner to believe that a forfeiture will not be insisted upon without an opportunity given him to redeem (*Insurance Co.* v. *Eggleston*, 96 U. S. 577), and no new or independent consideration is required to support a waiver of a condition in a contract requiring payment to be made upon a date designated. (*Prentice* v. *K. L. Insurance Co.*, 77 N. Y. 483; *Underwood* v. *F. J. S. Ins. Co.*, 57 N. Y. 500.) "

In *General Supply & Const. Co.* v. *Goelet* (241 N. Y. 28) the Court of Appeals said (at pp. 33, 34):

" The work was not completed on July 1st, 1907, and the plaintiff was permitted by the owner to continue performance of the work.

The owner thereby waived time as an essential element of the contract. (*Taylor* v. *Goelet*, 208 N. Y. 253.)  *  *  *

" Having indicated purpose to keep the contract alive in spite of delays on the part of the contractor, the owner could not suddenly abandon the purpose and treat as essential an element in the contract which he had previously waived, as ground for termination. (*Brede* v. *Rosedale Terrace Co.*, 216 N. Y. 246.) "

The authorities above cited clearly hold that a new consideration was not necessary in order to make the agreement of the night of April fourth effective.

Even though necessary, I think the record disclosed sufficient consideration. Plaintiff was not obligated to continue the play after April fourth, nor was its president personally required to waive the payment of his own salary. The members of the cast were enthusiastic to have the play proceed. They believed it would be a success. They had rehearsed for over three weeks, and they had faith in the ultimate success of the enterprise. As before stated, the plaintiff was not obligated to continue the play unless it chose to do so. The only way it could be continued was by the waiving or postponement of the payment of salaries for one week. Plaintiff's president agreed to waive the payment of his own salary in order that the members of the cast could be paid theirs. Plaintiff agreed to continue the production in reliance upon the agreement made by the members of the cast. In Restatement of the Law of Contracts (American Law Institute, 1932, vol. I, § 81) it is stated: " whatever consideration a promisor assents to as the price of his promise is legally sufficient consideration." In *Walton Water Co.* v. *Village of Walton* (238 N. Y. 46) the Court of Appeals said (at p. 51): " With adequacy, we are not concerned  *  *  *. Courts are slow to say that promises bearing upon their face the outward or formal tokens of a contract with mutual obligations, shall be set at naught on the assumption that the parties were oblivious of the advantages and burdens of their reciprocal engagements."

It is the contention of the appellant that no malice was shown on the part of the defendant in causing suspension of the play. However, malice is not an essential element of proof in an attempt to recover damages sustained for an unlawful act. In the recent case of *Hornstein* v. *Podwitz* (254 N. Y. 443) the Court of Appeals said (at p. 447):

" In *South Wales Miners' Federation* v. *Glamorgan Coal Co., Ltd.* ([1905] A. C. 239, 246), it was said: ' It is settled now that malice in the sense of spite or ill-will is not the gist of such an action.' And in *Quinn* v. *Leathem* ([1901] A. C. 495, 510) it was stated: ' That a

violation of legal right committed knowingly is a cause of action, and that it is a violation of legal right to interfere with contractual relations recognized by law if there be no sufficient justification for the interference.'

"This court has limited the meaning of the word 'malicious' as so used. 'This [malicious] does not necessarily mean actual malice or ill-will, but the intentional doing of a wrongful act without legal or social justification.' (*Campbell* v. *Gates*, 236 N. Y. 457.)"

In *Lamb* v. *Cheney & Son* (227 N. Y. 418) the Court of Appeals said (at p. 422): "The gist of the action is not the intent to injure, but to interfere without justification with plaintiff's contractual rights with knowledge thereof; or, as was very tersely stated by Lord MACNAGHTEN in *Quinn* v. *Leathem* ([1901] A. C. 495) where he said, referring to *Lumley* v. *Gye* (2 E. & B. 216): ' Speaking for myself, I have no hesitation in saying that I think the decision was right, not on the ground of malicious intention — that was not, I think, the gist of the action — but on the ground that a violation of legal right committed knowingly is a cause of action, and that it is a violation of legal right to interfere with contractual relations recognized by law if there be no sufficient justification for the interference.' " I think the evidence in this case shows a most inexcusable, arbitrary and dictatorial course of conduct on the part of the representatives of the defendant association.

But it is claimed on the part of the appellant that the defendant had no notice of the oral modification of the contract with Miss Sutherland. In answer to that, I think it very clearly appears that the defendant's representatives, Mufson and O'Neill, were fully informed of such oral modification before taking the arbitrary course that they did and in refusing to permit the continuance of the play. Certainly, the defendant is answerable for the acts of its agents committed during the performance and within the scope of their duties. Mufson's duties, according to the testimony of Dullzell, covered " general duties of the affairs of the association."

O'Neill's duties were to " see that the conditions of the contracts were observed, to advise Equity members." When Mufson and O'Neill went to the Vanderbilt Theatre it is conceded that they went in relation to the play " Right of Happiness." Obviously, they were authorized to collect the salary for Miss Sutherland. The whole conversation which occurred as the matinee of Saturday, April eleventh, was about to start, was that they demanded the salary due Miss Sutherland. They were vested with the widest authority which could be conferred upon representatives of the defendant association. They were fully informed as to the modification of the contract. They paid no attention thereto, and arbi-

trarily instructed the members of the cast to quit and refused to permit the curtain to go up unless their demands were met. Surely, notice to them was notice to the defendant. A principal is affected with constructive knowledge of all material facts of which his agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority. It is not necessary that the agent should inform the principal thereof. In *Henry* v. *Allen* (151 N. Y. 1) the Court of Appeals said (at p. 9): " The general rule that notice to the agent, while acting within the scope of his authority and in regard to a matter over which his authority extends, is notice to the principal, rests upon the duty of disclosure by the former to the latter of all the material facts coming to his knowledge with reference to the subject of his agency and upon the presumption that he has discharged that duty. (*Casco National Bank* v. *Clark*, 139 N. Y. 307, 313; *Hyatt* v. *Clark*, 118 N. Y. 563; *Case of the Distilled Spirits*, 11 Wall. 356, 367.) "

In *McConnell* v. *Hellwig* (190 App. Div. 244) the court stated (at p. 247): " The plaintiff testifies that he gave this notice to stop all transactions in the special account to Mayhew. If so, the notice was given and received by Mayhew within the scope of the authority and of the duties cast upon him by the defendants, and, therefore, notice to the agent Mayhew was notice to his principals, the defendants."

In *Morrison* v. *Chapman* (155 App. Div. 509, 514) this court held: " The underlying principle, which is well settled, is that, having put Cooper in a position to perpetuate the wrong, the defendants, and not plaintiff, must suffer the loss."

The testimony of defendant's witness Mufson in this respect was as follows:

" Q. Mr. Mufson, did you, in words or in substance, tell any member of the cast that he or she could not go on if Miss Sutherland's salary was not paid? A. The only words I gave to any members of the company were words to Miss Ruth Holden as Equity deputy for that company —

" The Court: As what?

" A. As Equity deputy — they are called deputies — for that company, to instruct the entire company, the rest of the company, that inasmuch as Miss Sutherland had not been paid her salary due April 4th, that there would be no performance, and to notify the rest of the company accordingly. That was my official instructions to her before I left."

When plaintiff's president remonstrated with Mufson and O'Neill for their arbitrary conduct in closing his play, he testified as follows: " Well, that is unheard of. I never heard of such a thing before

being done, and I have been in productions, I have been in the theatre." To which Mufson replied: "It is going to be done now. We represent Equity, and you will abide by what we tell you." And plaintiff replied: "Do you realize that I have got money in this production? You are cutting off my every chance of possibly running this play, and I have worked hard on it. I have put a lot of money into it, and I have interested further capital which may be here this afternoon. If I do not give these performances you are killing my every chance to go on with this play." To this plea Mufson delivered the arbitrary and dictatorial statement: "I am not interested in you or what you have to say. You either pay Miss Sutherland right now, or your curtain does not go up." And Mufson then walked away from the plaintiff's president.

The appellant contends that, under the provisions of subdivision "T" of the regulations attached to the contract between the plaintiff and Miss Sutherland, there can be no "changes" in the contract until such proposed changes are submitted by the manager to Equity for its approval. In the first place, the agreement entered into between plaintiff and the members of the cast did not work any change in the contract. At most, the agreement entered into merely waived the payment of salaries until the close of the current week's performances. In the second place, the construction which the appellant seeks to place on said subdivision "T" of the regulations is most unconscionable and unreasonable. The contract of hiring was prepared by and was in the standard form of the defendant labor union, but upon its execution it became no more or less than a contract between DuRoy & LeMaistre, Inc., designated therein as "Manager," and Anne Sutherland, therein called "Actor." It would be passing strange and most unconscionable that these contracting parties should be denied the right to waive for a week the payment of the compensation due the actors at the whim of this labor union. No change in the terms of the contract was contemplated or made. The interference by Equity in this case was purely gratuitous. In agreeing to postpone the payment of salaries for a week, to which all of the parties freely agreed, recognizing that such postponement was necessary if the play was to continue, the parties acted well within their rights. What possible concern was it to Equity if the members of the cast agreed to postpone the payment of their salaries for a few days? The *ipse dixit* attitude assumed by defendant's representatives was, under the circumstances, most unreasonable and reprehensible.

In his brief and upon the argument of the appeal appellant's counsel urged that the verdict was due to passion and prejudice, but nowhere in the record is there any indication of any attempt to

excite the jury or to induce it to in anywise be governed by anything but the evidence in the case. It is, furthermore, the contention of the appellant that the verdict of the jury was due to inadequate instructions and failure of the court to instruct the jury in several particulars. Yet, reading the charge of the court, it is at once apparent that the court instructed the jury properly and fully as to its duties. The charge, on the whole, was a model and a correct statement of the law. No single exception of any moment was taken by the defendant's trial counsel. There were no requests to charge in any of the respects concerning which the appellant now insists the charge was inadequate.

The appellant also contends that there was an improper exclusion of testimony by the trial court and the admission of incompetent testimony. I have examined these alleged errors and find no merit in either of them. The testimony excluded was properly excluded as hearsay, and there was no testimony admitted that was not entirely competent.

Finally, the contention of the appellant is that no proper damages were proven. I think the court, in reducing the verdict and in limiting the verdict of the jury to the actual damages which flowed from the destruction of the plaintiff's contract with the members of the cast, was entirely proper. I think under the well-settled rules of law the verdict, as finally sustained, represents such damages as naturally flowed from the defendant's illegal acts.

All questions of fact presented by the testimony at the trial were resolved by the jury in favor of the plaintiff. The jury's verdict was not against the weight of the evidence.

The judgment appealed from should be affirmed, with costs to plaintiff-respondent against defendant-appellant.

Judgment reversed, with costs, and complaint dismissed, with costs.