## PHILLIPS v. BELDING HEMINWAY CO.

District Court, S. D. New York.
July 29, 1943.

Bondy & Schloss, of New York City, for plaintiff.

Dwight, Harris, Koegel & Caskey, of New York City (Frederick W. P. Lorenzen, of New York City, of counsel), for defendant.

GODDARD, District Judge.

This is a suit to recover damages alleged to have been sustained by the plaintiff Phillips as a result of the defendant, Belding Heminway Company, inducing the Southern Mills, Inc., to breach a contract alleged to have existed between the plaintiff and the Southern Mills, Inc.

Southern Mills, Inc. [hereinafter referred to as Southern], a North Carolina corporation engaged in the manufacture of cotton yarn at or near Lincolnton, North Carolina, was organized in 1940 by Butler, its president, Putnam, its vice-president, M. M. Rudisill, secretary and treasurer, and his brother, C. A. Rudisill. M. M. Rudisill [hereinafter referred to as Rudisill], at the time with which we are concerned, held options upon the stock of the others which, if he acquired, would make him sole stockholder of Southern.

In the early part of February, 1942, Rudisill told Phillips, a cotton broker, that in exchange for a loan of $85,000 at four per cent, Southern would sell to the lender its entire production of yarn—some 12,500 pounds a week—and would repay

the loan at the rate of $1,000 a week; that the term of the loan would be ninety-four weeks and the lender might have the full production for that period or for the period of Southern's lease on the mill building which it occupied, namely, until September, 1945. Phillips submitted the proposition to another possible customer, but nothing came of it, and on February 21, 1942, it was agreed between him and Rudisill that Phillips would use his best efforts to obtain the loan and that in consideration thereof, that he would be given until February 28th to "tie up" the deal; that if he succeeded in obtaining the loan Phillips would become the sales agent for Southern and be entitled to three per cent commission on the sale of its output to the lender for the duration of the lease of three and one-half years, and for any extension of contract. The substance of this agreement is set forth in a letter of February 23, 1942, addressed to Phillips, the opening sentence of which is, "I hereby agree * * *" and signed "M. M. Rudisill", with the notation at the bottom of the page in Rudisill's handwriting: "This is subject to conditions of my contract with associates". This agreement between Rudisill and Phillips was orally extended by Rudisill for the term of Rudisill's option to purchase the stock of his associates in Southern. However, there is no proof that defendant was advised of this extension.

Belding Heminway Company, a Connecticut corporation with a New York office, engaged in the manufacture of thread, desired to assure itself of a future supply of plied yarn for its thread. Phillips, who had sold cotton yarn to the defendant as sales representative for another mill, learning that the defendant was in the market for plied yarn, informed the defendant that Southern was in need of cash and that if it could obtain a loan, it would sell its output to the lender.

On March 5, 1942, after negotiations in which Phillips participated, a contract was entered into between Belding Heminway Company and L. E. Rudisill, attorney for M. M. Rudisill who, at that time, was secretary and treasurer of Southern and holder of one-sixth of its capital stock. This contract provided for a loan of $85,000 by Belding Heminway to Southern and an agreement by Southern to sell and Belding Heminway to buy the Southern's output of plied yarn. The contract was to run for three and one half years, either party, however, having the option to cancel it upon six months notice and the payment of $25,000. Belding Heminway also had an option upon certain terms to purchase the plant and assets of Southern. It further provided that the contract should be closed by the delivery, among other things, of a certified copy of a resolution of Southern's board of directors approving the contract and an indemnity bond to guarantee Southern's performance of the contract. On March 10, 1942, at Lincolnton, North Carolina, where the parties met for the proposed closing, it was reported that it had been impossible to obtain the stipulated indemnity bond, and to quote the complaint: "The said agreement of March 5th became null, void and of no effect by virtue of the inability of Southern to furnish a performance bond which it was obligated to do * * *". [par. 10].

Subsequently new negotiations were entered into and on March 17 Rudisill came to New York and the plaintiff arranged for another meeting on that day which was attended by Mr. Rudisill and Mr. Phillips, Mr. Johnson, vice-president of Belding Heminway Company, and Mr. Fisher, attorney for Belding Heminway Company. Belding Heminway had offered to acquire seventy-five per cent of Southern stock and to have an option for five years to purchase from Rudisill the remaining twenty-five per cent for $40,000, and Rudisill to have an option to repurchase the Belding Heminway stockholding if it did not exercise its option. Rudisill declined this offer because he said that if Belding Heminway acquired this large holding of stock in Southern, it would have a large interest in certain cotton options which at the time showed a profit of between $25,000 to $35,000 to Southern, and as he had an option to purchase the five-sixth stock interest in Southern, which he did not own, regarded this as a personal profit which he wanted to realize. Belding Heminway replied that they were not interested in the cotton options and the options would be excluded from the transaction and an agreement was reached that afternoon, which was that a new corporation would be organized; that Belding Heminway would own seventy-five per cent of its stock, and Southern was to sell to that corporation only its machinery for $85,000 in cash and twenty-five per cent of the new

company's stock, with an option to Belding Heminway to purchase Southern's stock interest for $40,000. The agreement was reduced to writing in the form of a letter from Belding Heminway Company to the Southern Mills, Inc., and accepted by Rudisill, as secretary and treasurer of Southern, and by him personally. The letter also provided that "This transaction is to be authorized by the stockholders and directors of your company [Southern] and we are to have certified copies of their resolutions."

According to a certified balance sheet of Southern furnished to the defendant, the machinery of Southern, for which defendant had agreed to pay $85,000 cash and twenty-five per cent of the stock in the new corporation, was valued by Southern at a net figure of $46,112.48. Its current liabilities exceeded its current assets by some $50,000 and its net worth was a deficit of nearly $5,000 and its cash position was reflected by a bank overdraft. Southern owned the machinery and equipment, but rented the building.

On March 19 at Lincolnton, North Carolina, Rudisill, Butler, president of Southern, Putnam, its vice-president, several of its stockholders, and Rudisill's lawyer, met. Rudisill explained to them the proposed deal and the provisions for the payment of Southern's debts to some of the stockholders. Resolutions approving the agreement with the defendant were passed both at a directors' meeting and at a stockholders' meeting of Southern.

The proposed new corporation was organized under the name "Summit Yarn Company". $85,000 was paid to Southern and a certificate for twenty five per cent of the new company's stock was issued to Southern, and a bill of sale received by Southern transferring its machinery to the Summit Yarn Company.

The plaintiff testified that in the course of the negotiations on March 17th, the representatives of the defendant agreed to assume an obligation to Phillips for commissions either in behalf of Belding Heminway or the proposed new company; but I am fully convinced, after seeing the witnesses and hearing the testimony, that no such statement was made by the representatives of the defendant; and I am also convinced that when Phillips at the conference, which resulted in the contract of March 5th, suggested that his claimed commission arrangement with Southern should be included in the contract, his suggestion was emphatically rejected by the representative of the defendant and was told by him that Belding Heminway would have nothing whatever to do with any commissions. At the time the final contract between Southern and the defendant was closed, plaintiff made no objection and he made no claim against the defendant until some weeks later.

The issue presented is whether as a result of the closing of the transaction between the defendant and Southern on March 19, 1942, the defendant is liable to plaintiff for inducing Southern to breach a contract with plaintiff. The contract was consummated on March 19th in Lincolnton, North Carolina. Not only did the contract itself provide that the transaction is to be authorized by the stockholders of Southern, but under the statutes of North Carolina, where Southern was incorporated, approval by a two-thirds vote of its stockholders is necessary when the corporation sells what consists of practically all its corporate property. It was at Lincolnton that certified copies of the resolutions and the bill of sale were delivered to the representative of defendant and the defendant's cheque for $85,000 was delivered.

"The place of wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place."

"The law of the place of wrong determines whether a person has sustained a legal injury." Restatement of Conflict of Laws §§ 377 and 378.

See also Hunter v. Derby Foods, 2 Cir., 110 F.2d 970, 133 A.L.R. 255; Conklin v. Canadian-Colonial Airways, Inc., 266 N.Y. 244, 194 N.E. 692. It appears therefor that the issue is governed by the laws of North Carolina.

Lumley v. Gye, 2 El. & Bl. 215, held that plaintiff was entitled to damages when defendant had maliciously induced an opera singer under exclusive contract to plaintiff, to break her contract. This principle has been generally adopted in America; in some states, including North Carolina, to a limited extent.

In Swain v. Johnson, J. F. Noble and W. A. West, 151 N.C. 93, 65 S.E. 619, 28 L.R.A.,N.S., 615; the plaintiff had contracted with defendant, Noble, to purchase all the pine and juniper timber on certain land. West and Johnson conspired together

and induced Noble to violate his contract with the plaintiff and bought the land from Noble for a corporation in which West and Johnson were interested. The trial court granted a motion to nonsuit and was affirmed by the Appellate Court which refused to follow the dictum in Jones v. Stanly, 76 N.C. 355, 356, and adopted the principle stated by Judge Cooley that "an action cannot in general be maintained for inducing a third person to break his contract with the plaintiff; the consequences, after all, being only a broken contract, for which the party to the contract may have his remedy by suing upon it [Cooley on Torts, 497]", and the court went on to say: "To this rule there are but two generally recognized exceptions; one where servants and apprentices are induced from malicious motives to leave their master before the term of service expires, and the other arises where a person has been procured *against his will,* or contract to his purpose, by coercion or deception of another, to break his contract. * * * It is only where the contract would have been fulfilled but for the false and fraudulent representations of a third person that an action will lie against such third person." [Emphasis the court's.]

In Holder et ux v. Atlantic Joint-Stock Land Bank of Raleigh, 298 N.C. 38, 178 S.E. 861, it was held that plaintiff mortgagor had no cause of action against a mortgagee bank which had induced a prospective vendee of the mortgaged property to break a contract with plaintiff and purchase the land at a lower price after the foreclosure from the bank where there was no allegation that defendant made any false or fraudulent representation and no allegation that defendant breached any contract with plaintiff, and the court said: "Therefore, it would seem that any loss that the plaintiffs suffered by reason of the defendant's acts in the premises was the result of lawful competition, and the law does not protect one against competition. Disturbance or loss resulting therefrom is damnum absque injuria." 178 S.E. at page 862.

In the case at bar there is no evidence that any fraud or deception was practiced on Southern, or that Southern was induced against its will by fraud and deception to breach any contract which it may have had with plaintiff. The fact is that Rudisill believed he was making a good deal and was anxious to consummate the transaction. Under the law of North Carolina the plaintiff has sustained no legal injury and the complaint should be dismissed on its merits. Even if it were held that the contract between the defendant and Southern was entered into in New York and the law of New York be applied, the plaintiff has failed to prove a cause of action against the defendant involving the tort of inducing a breach of contract.

In Lamb v. S. Cheney & Son, 227 N.Y. 418, 125 N.E. 817; Campbell v. Gates, 236 N.Y. 457, 141 N.E. 914, and Hornstein v. Podwitz, 254 N.Y. 443, 173 N.E. 674, 84 A.L.R. 1, the court before trial sustained complaints which included the necessary allegations for a cause of action involving the tort of inducing a breach of contract. The complaint in Lamb v. Cheney & Son charged that defendant had "maliciously enticed, induced, and procured" a third party to break his contract of employment with the plaintiff, and the court said: "The act is malicious when the thing done is with the knowledge of plaintiff's rights, and with the intent to interfere therewith. In a legal sense it means a wrongful act, done intentionally, without just cause or excuse." 227 N.Y. at page 422, 125 N.E. at page 818.

Campbell v. Gates held that a complaint alleging that plaintiff and another, whose services were unique by reason of experience and skill, had entered into a contract and that defendant, with notice of that contract, intentionally and maliciously induced the other to break his agreement with plaintiff by reason of which plaintiff had sustained damage, states a cause of action and said: " * * * if A has a legal contract with B, either for the rendition of service or any other purpose, and C, having knowledge of the existence thereof, intentionally and knowingly, and without reasonable justification or excuse, induces B to break the contract, by reason of which A sustains damage, an action will lie by A against C to recover the same." 236 N.Y. at page 460, 141 N.E. at page 915.

In Hornstein v. Podwitz et al., 254 N.Y. 443, 173 N.E. 674, 84 A.L.R. 1, the plaintiff was a broker. The substance of his allegations were that the defendants who were respectively the purchaser and the seller of a piece of real estate, conspired together to deprive plaintiff of his commission for bringing about the sale by secretly closing the transaction under an agreement to divide the commission among

themselves, it was held that the complaint set forth a cause of action for wrongfully inducing a breach of contract.

The most recent case in the Court of Appeals is Associated Flour Haulers, etc., v. Hoffman et al., 282 N.Y. 173, 26 N.E.2d 7. The plaintiff was an association of flour trucking concerns that had a contract with a labor Union which, under its Charter, had the exclusive right to furnish the personnel to operate the flour trucks. Defendant was a general truckman employed in hauling flour and other goods, and employed a Union which furnished men who were not exclusively employed in hauling flour and which had a lower scale of wages that enabled the defendant, as part of his general hauling business, to underbid the members of the plaintiff association in hauling flour and succeeded in diverting much of the business that plaintiff would otherwise have had. Plaintiff sued to recover damages for inducing the breach of its known contractual rights. The court dismissed the complaint on the ground that there was no cause of action, and said: "Undoubtedly a cause of action exists where one having knowledge of an existing valid contract between others intentionally, knowingly and without reasonable justification induces one of the parties to breach the contract with resulting damage to the other. Such an action, however, is predicated upon an intentional interference, without justification, with known contractual rights *possessed by the party suing*." 282 N.Y. at page 180, 26 N.E.2d at page 10.

As I understand the New York decisions, there is no cause of action in New York for inducing a breach of contract unless there was an intentional interference without justification with a third party's contractual rights with knowledge thereof and the breach is not merely incidentally caused by the act of defendant, or unless defendant committed a wrongful act without legal or social justification. Cf. Garcia Sugars Corp. v. New York C. & S. Exchange, Inc., et al., Sup., 7 N.Y.S.2d 532; DuRoy & Le Maistre, Inc., v. Gilmore, etc., 246 App.Div. 37, 284 N.Y.S. 385; Thompson Co. v. Winchell, 244 App.Div. 195, 278 N.Y.S. 781; Knapp v. Penfield, 143 Misc. 132, 256 N.Y.S. 41; 36 Harvard Law Review 663.

In the case at bar there is no evidence that the defendant sought to obtain for itself the plaintiff's commissions. The defendant was solely concerned with the legitimate object of assuring itself a future supply of cotton yarn; it did not act without justification and it was not actuated by maliciousness.

Furthermore, there is no proof that the plaintiff would have been able to negotiate a contract with anyone which would have entitled him to commissions upon the output of Southern.

The defendant also urges as a ground for dismissal of the suit that the complaint charges the defendant with inducing the breach of a contract entered into by Phillips and Southern on February 21, 1942, and that the evidence is that there was no contract between Southern and Phillips; that any contract Phillips may have had was with Rudisill. However, it is unnecessary to discuss this defense in view of the fact that the case must be decided in favor of the defendant for the reasons stated. The plaintiff may have a claim against Rudisill or Southern, but I am of the opinion that he has no claim against this defendant.

Defendant may have a decree dismissing the complaint on the merits.

Defendant may submit proposed findings of facts and conclusions of law in accordance with the above upon ten days notice.