Maurice A. KRISEL, Plaintiff,

v.

Rafael DURAN, Sam J. Van Hining, Economic Development Administration of Puerto Rico and Phillips Petroleum Company, Defendants.

No. 65 Civ. 2702.

United States District Court
S. D. New York.

Aug. 17, 1966.

Cardozo & Cardozo, New York City, for plaintiff; Benjamin M. Cardozo, Edwin D. Kyle, New York City, of counsel.

Rafael Hernandez Colon, Atty. Gen., Commonwealth of Puerto Rico, Arnold & Porter, Washington, D. C., William D. Rogers, John T. Rigby, Washington, D. C., of counsel.

Breed, Abbott & Morgan, New York City, Robert A. Bicks, New York City, of counsel, for Commonwealth of Puerto Rico.

Sullivan & Cromwell, New York City, for Phillips Petroleum Co.; Robert Mac-Crate, Thomas E. Patton, New York City, of counsel.

WEINFELD, District Judge.

Plaintiff by this action seeks thirty million dollars damages, injunctive relief, an accounting and to impress a trust. The defendants are the Economic Development Administration of Puerto Rico (EDA), its administrator, Rafael Durand, its economic consultant, Sam J. Van Hyning,[1] and Phillips Petroleum Company (Phillips).

The essence of plaintiff's claim is that he conceived a novel and original program for the development of a petro-chemical plant in Puerto Rico and for obtaining a substantial oil import quota therefor; that it was revealed in trust and confidence to the defendants Durand and Van Hyning, as officials of EDA, upon an agreement of nondisclosure; that in breach thereof they and EDA disclosed the program to Phillips; that the defendants wrongfully appropriated plaintiff's program when Phillips undertook its development under an agreement whereby EDA is to share in its profits and benefits.

The defendant EDA moves to dismiss the complaint on various grounds which, in the main, rest upon its contention that it is an agency of the government of the Commonwealth of Puerto Rico, and as such enjoys sovereign immunity and is not subject to diversity jurisdiction. It moves to dismiss under:

(a) Rule 12(b) (1) of the Federal Rules of Civil Procedure for lack of jurisdiction over the subject matter based upon nondiversity of citizenship;[2]

(b) Rule 12(b) (2) for lack of jurisdiction over the person, since it has not consented to be sued;

(c) Rule 12(b) (5) for insufficient service of process on the ground that as a "state"[3] or "governmental organ-

---

1. The individual defendants have not been served with process. Plaintiff, in captioning his complaint, has misspelled the names of both individual defendants. Their names are properly spelled in the text of this opinion.

2. Subject matter jurisdiction embraces diversity of citizenship as well as the required jurisdictional amount. Page v. Wright, 116 F.2d 449, 454 (7th Cir. 1940), appeal dismissed, 312 U.S. 710, 61 S.Ct. 831, 85 L.Ed. 1142 (1941); Clemente Engineering Co. v. DeLiso Constr. Co., 53 F.Supp. 434 (D.Conn.1944).

3. Whatever the true political nature of the Commonwealth, it possesses the sovereign immunity of a state, see People of Puerto Rico v. Shell Co., 302 U.S. 253, 262, 58 S.Ct. 167, 82 L.Ed. 235 (1937); People of Porto Rico v. Rosaly y Castillo, 227 U.S. 270, 274, 33 S.Ct. 352, 57 L.Ed. 507 (1913), and the parties appear in agreement that for the purposes of this suit it may be deemed a state. For a discussion of the Commonwealth's status and characteristics, see Magruder, The Commonwealth Status of Puerto Rico, 15 U.Pitt.L.Rev. 1 (1953). See also Moreno

ization" it was not served with process as required under Rule 4(d) (6).

EDA also moves under Rule 12(b) (6) to dismiss the complaint for failure to state a claim, or in the alternative for summary judgment pursuant to Rule 56. Phillips also moves (by way of cross-motion) for summary judgment. On this aspect of the motion the parties have submitted affidavits, including the deposition of the plaintiff and exhibits. Phillips' cross-motion was made in response to plaintiff's motion directed to its answer.

## I

We first consider the motion of the defendant EDA. Federal jurisdiction is alleged upon diversity of citizenship.[4] Plaintiff is a citizen of the State of New York. The complaint, as amended, alleges that EDA is a body corporate organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business in San Juan, Puerto Rico, and is a citizen of Puerto Rico. Phillips is alleged to be a Delaware corporation engaged in business within this district, with its principal place of business in the State of Oklahoma.

EDA challenges federal diversity jurisdiction on the ground that it is not a citizen of Puerto Rico but in fact is the "arm or *alter ego*"[5] of the Commonwealth of Puerto Rico, which is the real party in interest, and that since diversity jurisdiction does not extend to controversies between a state and a citizen of another state, the action must fail.[6] As plaintiff concedes, "either the defendant EDA is a 'citizen' within the meaning of § 1332, or the Court lacks diversity jurisdiction over EDA." While the issue of diversity jurisdiction is separate from that of sovereign immunity,[7] as a practical matter the fact determination of whether the EDA is the agency of the Commonwealth resolves both issues.

██ The pleadings do not control; the fact that the complaint names EDA as a defendant does not preclude inquiry to ascertain who in fact is the real party in interest in order to determine whether diversity jurisdiction exists. The issue is to be determined by the essential nature and effect of the suit as disclosed by the entire record,[8] and if it appears that the Commonwealth is the real, substantial party against whom the claim is asserted, the jurisdictional attack based upon the plea of sovereign immunity must be upheld even though the Commonwealth is not specifically named as a defendant.[9]

Rios v. United States, 256 F.2d 68, 71–72 (1st Cir. 1958); Figueroa v. People of Puerto Rico, 232 F.2d 615, 616–19 (1st Cir. 1956); Arbona v. Kenton, 126 F. Supp. 366 (S.D.N.Y.1954).

4. See 28 U.S.C. § 1332. Under the diversity statute, Puerto Rico is a state. See § 1332(d); Lummus Co. v. Commonwealth Oil Refining Co., 195 F.Supp. 47, 48–51 (S.D.N.Y.1961).

5. State Highway Comm'n of Wyoming v. Utah Constr. Co., 278 U.S. 194, 199, 49 S.Ct. 104, 73 L.Ed. 262 (1929).

6. See id. at 199–200, 49 S.Ct. 104; O'Neill v. Early, 208 F.2d 286, 289 (4th Cir. 1953); Broadwater-Missouri Water Users' Ass'n v. Montana Power Co., 139 F.2d 998, 999 (9th Cir. 1944); North Dakota v. National Milling & Cereal Co., 114 F.2d 777, 779 (8th Cir. 1940).

7. See State Highway Comm'n of Wyoming v. Utah Constr. Co., 278 U.S. 194, 199–200, 49 S.Ct. 104, 73 L.Ed. 262 (1929);

North Dakota v. National Milling & Cereal Co., 114 F.2d 777, 779 (8th Cir. 1940); DeLong Corp. v. Oregon State Highway Comm'n, 233 F.Supp. 7, 10 (D. Ore.1964), aff'd, 343 F.2d 911 (9th Cir.), cert. denied, 382 U.S. 877, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965); Weyerhaeuser Co. v. State Roads Comm'n, 187 F.Supp. 766, 770–71 (D.Md.1960).

8. In re Ayers, 123 U.S. 443, 492, 8 S.Ct. 164, 31 L.Ed. 216 (1887); Harrison Constr. Co. v. Ohio Turnpike Comm'n, 272 F.2d 337, 339 (6th Cir. 1959); Weyerhaeuser Co. v. State Roads Comm'n, 187 F.Supp. 766, 771 (D.Md.1960); First Nat'l Benefit Soc'y v. Garrison, 58 F. Supp. 972, 990–991 (S.D.Cal.1945), aff'd, 155 F.2d 522 (9th Cir. 1946).

9. See Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945); Ex parte State of New York, No. 1, 256 U.S. 490, 500, 41 S.Ct. 588, 65 L.Ed. 1057 (1921); Hopkins v. Clemson Agricultural College,

■ Since the issue is one of federal jurisdiction, governed by the legislation which defines the status of Puerto Rico [10] and the diversity statute, federal law controls.[11] However, local law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance.[12]

■ Among the other factors, no one of which is conclusive,[13] perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury;[14] significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function;[15] whether it has been separately incorporated;[16] the degree of autonomy over its operations;[17] whether it has the power to sue and be sued [18] and to enter into contracts;[19] whether its property is immune from state taxation,[20] and whether the sovereign has immunized itself from responsibility for the agency's operations.[21]

221 U.S. 636, 642, 31 S.Ct. 654, 55 L. Ed. 890 (1911); Ex parte State of Nebraska, 209 U.S. 436, 445, 28 S.Ct. 581, 52 L.Ed. 876 (1908); People of State of Cal. ex rel. McColgan v. Bruce, 129 F.2d 421, 423 (9th Cir.), cert. denied, 317 U.S. 678, 63 S.Ct. 157, 87 L. Ed. 544 (1942); DeLong Corp. v. Oregon State Highway Comm'n, 233 F.Supp. 7, 10 (D.Ore.1964), aff'd, 343 F.2d 911 (9th Cir.), cert. denied, 382 U.S. 877, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965).

10. See Organic Act of Puerto Rico, 39 Stat. 951 (1917), as amended, 48 U.S.C. §§ 731–916. Cf. People of Porto Rico v. Rosaly y Castillo, 227 U.S. 270, 33 S.Ct. 352, 57 L.Ed. 507 (1913).

11. Cf. Board of Supervisors v. Ludley, 252 F.2d 372, 375–376 (5th Cir.), cert. denied, 358 U.S. 819, 79 S.Ct. 31, 3 L.Ed.2d 61 (1958), and cert. denied sub nom. Louisiana State Bd. of Educ. v. Lark, 358 U.S. 820, 79 S.Ct. 32, 3 L.Ed. 2d 61 (1958); DeLong Corp. v. Oregon State Highway Comm'n, 233 F.Supp. 7, 10 (D.Ore.1964), aff'd. 343 F.2d 911 (9th Cir.), cert. denied, 382 U.S. 877, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965); Fleming v. Upper Dublin Pub. School Dist., 141 F. Supp. 813 (E.D.Pa.1956).

12. See cases cited in note 11 supra.

13. See Pennsylvania Turnpike Comm'n v. Welsh, 188 F.2d 447, 450 (3d Cir.1951).

14. See Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed.2d 389 (1945); State Highway Comm'n of Wyoming v. Utah Constr. Co., 278 U.S. 194, 199, 49 S.Ct. 104, 73 L. Ed. 262 (1929); O'Neill v. Early, 208 F. 2d 286, 288 (4th Cir.1953); Cook v. Davis, 178 F.2d 595, 599 (5th Cir.), cert. denied, 340 U.S. 811, 71 S.Ct. 38, 95 L. Ed. 596 (1950); Fowler v. California Toll-Bridge Authority, 128 F.2d 549 (9th Cir.1942); Sehlmeyer v. Romeo Co., 117 F.2d 996, 998 (9th Cir.1941). Compare Miller v. State of Vermont, 201 F.Supp. 930, 932–933 (D.Vt.1962).

15. See Kansas Turnpike Authority v. Abramson, 275 F.2d 711, 713 (10th Cir.), cert. denied, 363 U.S. 813, 80 S.Ct. 1250, 4 L.Ed.2d 1154 (1960); United States v. Fuston, 143 F.2d 76, 78 (10th Cir.), cert. denied, 323 U.S. 768, 65 S.Ct. 121, 89 L. Ed. 614 (1944); Fowler v. California Toll-Bridge Authority, 128 F.2d 549 (9th Cir.1942); Sehlmeyer v. Romeo Co., 117 F.2d 996, 998 (9th Cir.1941); De Scala v. Panama Canal Co., 222 F.Supp. 931, 932 (S.D.N.Y.1963).

16. See United States v. Edgerton & Sons, 178 F.2d 763, 764 (2d Cir.1949); United States Department of Agriculture v. Hunter, 171 F.2d 793, 795 (5th Cir. 1949); De Scala v. Panama Canal Co., 222 F.Supp. 931, 932–933 (S.D.N.Y. 1963). But see Hunkin-Conkey Constr. Co. v. Pennsylvania Turnpike Comm'n, 34 F.Supp. 26, 28–29 (M.D.Pa.1940).

17. See Aerated Prods. Co. v. Department of Health, 59 F.Supp. 652, 660 (D. N.J.1945), aff'd, 159 F.2d 851, 853–854 (3d Cir.1947).

18. See United States Department of Agriculture v. Hunter, 171 F.2d 793, 795 (5th Cir.1949); De Scala v. Panama Canal Co., 222 F.Supp. 931, 932–933 (S.D.N.Y. 1963).

19. See Cowles v. Mercer County, 7 Wall. 118, 74 U.S. 118, 122, 19 L.Ed. 86 (1868).

20. See Pennsylvania Turnpike Comm'n v. Welsh, 188 F.2d 447, 450 (3d Cir.1951).

21. See Harrison Constr. Co. v. Ohio Turnpike Comm'n, 272 F.2d 337, 339 (6th Cir. 1959); Pennsylvania Turnpike Comm'n v. Welsh, 188 F.2d 447, 450 (3d Cir. 1951).

Before analyzing the nature, structure and functions of EDA, it is desirable that the underlying purpose which brought it into being be considered. In the 1940's Puerto Rico's economic life was geared principally to sugar production and distribution—essentially its economy was agrarian. In an effort to expand and to diversify its economy, and to increase employment—all to raise the standard of living of its citizens—the government instituted a vast program of industrial and economic development. Tax benefits, financial assistance in plant construction and other incentives were offered to potential investors; offices were maintained in the United States and Canada to publicize the advantages and opportunities available to investors in Puerto Rico and to attract risk capital.

The program had marked success in the two decades of its existence. It is stated that new industrial plants are being established at an average rate of 250 per year and that the economy, now widely diversified, enjoys one of the highest rates of annual income growth in the world—some ten per cent.

Prior to 1950 the vehicle used by the Commonwealth to carry out the program of industrial and economic development, sometimes referred to as "Operation Bootstrap," was a public corporation, the Puerto Rico Industrial Development Company (PRIDCO). Its activities were two-gauged, one operational and the other promotional. In 1950 the promotional aspects of the program were transferred to EDA. The origin of the transfer and the details with respect to the differences in functions and duties of the two agencies are discussed hereafter, since they bear significantly on the issue of sovereign immunity.

Since the 1950's petroleum refineries and related petro-chemical production and processes have been a critical part of Puerto Rico's economic development program. Its importance to Puerto Rico's industrial and economic growth, to compensate for the island's scarcity of materials, has long been recognized. An essential of petro-chemical production is oil feed stock for refining, the derivatives of which are fed into related petro-chemical and chemical plants for ultimate processing into synthetic fibers, plastics and other consumer products, marketable in Puerto Rico and abroad. In end result product diversification, industrial expansion, increased employment and improved housing are achieved. Because of proximity and cost factors, Venezuela has been the principal source of the required oil feed stock.

However, in March 1959, the importation into Puerto Rico and the United States of crude oil and crude oil derivatives, the feed stock essential for petrochemical processes, was restricted by proclamation of the President of the United States.[22] Quotas for the importation of oil were granted by the United States Secretary of Interior on a sliding scale according to the refinery input to those who at the effective date of the mandatory program operated refineries or had histories of oil importation.[23] When the restrictive order became effective, two oil companies had already been in operation in Puerto Rico and they, as well as nonrefinery operators, had with Commonwealth support obtained quotas for the importation of oil.

The instant suit centers about plaintiff's submission in September 1961 to EDA of a proposal for a petro-chemical complex which contemplated the erection of a refinery for processing and petrochemical plants, together with a plan which he asserts he conceived for a modification of oil import quota restrictions in order to obtain the essential crude oil. The proposal was hinged to the importation into Puerto Rico from Venezuela of 35–40,000 barrels of crude oil per

**22.** See Presidential Proclamation No. 3279, 24 Fed.Reg. 1781 (1959).

**23.** See generally Atlantic Refining Co. v. Standard Oil Co., 113 U.S.App.D.C. 20, 304 F.2d 387 (1962), which discusses various aspects of the oil import program and the reasons for its promulgation.

day for the first two-three years and ultimately of 70,000 barrels per day.

While the Court at this point does not consider the merits of plaintiff's claim, he contends that his program was novel, original, and submitted to EDA in confidence; that he was the first to conceive a practical program for building a plant and obtaining the required oil feed stock. The essence of his claim of novelty, as his complaint alleges, was utilizing the political power and prestige of the Commonwealth and its officials in support of the application for the import quota of petroleum required for the proposed project.

His letter of September 25, 1961 to Rafael Durand, administrator of EDA, explicitly states that the program is "predicated on your government issuing to our enterprise a commitment that * * * the Commonwealth government will obtain a quota of foreign crude oil, preferably Venezuelan, for our use sufficient in barrelage per day to warrant our going ahead with our plans. * * * The project depends entirely on your obtaining the quota of oil required." Thus, whatever the merits of the plaintiff's basic claim, it is clear that the Commonwealth itself was to play the essential role under plaintiff's projected program. Durand, however, on October 16, 1961, advised plaintiff that the Commonwealth would "not entertain a commitment to satisfy the * * * condition in your letter of September 25 to me."

Other groups as well as EDA have been interested in the development of a petrochemical complex. Among these was the defendant Phillips, which since 1945 has operated one of the world's largest petrochemical plants in Texas and which, after prior negotiations in January 1964, with the support of EDA and the Commonwealth, applied to the United States Department of the Interior for a quota of 50,000 barrels per day of selected petroleum feed stock to be imported into Puerto Rico for refinement and use in a contemplated chemical complex. After due notice a public hearing was held on the Phillips application in July 1964. On February 11, 1965 the Secretary of the Interior announced he favored the establishment of a major petro-chemical complex in Puerto Rico and that his department would enter into final negotiations with Phillips to determine the feasibility of a project to yield "maximum economic benefits and maximum employment opportunities for Puerto Rico." Within a week of this announcement, on February 18, plaintiff wrote Phillips contending that the plan so tentatively approved by the Department of the Interior was the very one he had proposed and disclosed in confidence to EDA officials in 1961, and that he planned legal action against Phillips and others for alleged appropriation of his property.[24]

On May 14, 1965 the Department of the Interior gave final approval to the Phillips plan, following which, on May 27, 1965, Phillips and the Commonwealth of Puerto Rico entered into an agreement embodying the plan.

Against this broad outline of the nature of plaintiff's claim as alleged against EDA, we now analyze the legislation which created it, its structure and relationship to the Commonwealth, and other factors which bear on the issue of who is the real, substantial party in interest against whom the claim is asserted.

EDA was created under Reorganization Plan No. 10 of 1950, and by implementing legislation was "organized to operate as an agency of the Government of Puerto Rico * * *."[25] Its principal functions are economic research, industrial promotion and the promotion of tourism—functions previously performed by the Puerto Rico Industrial Development Company (PRIDCO), a public corporation. EDA's affairs are directed by an administrator appointed by the Governor, with the advice and consent of the

---

24. Phillips' denial of plaintiff's charges and its position with respect thereto is considered under its cross-motion for summary judgment.

25. Laws of Puerto Rico Ann. tit. 23, § 231.

Senate.[26]  Despite plaintiff's allegation that it is a "body corporate," EDA is not incorporated, nor does it have power to sue or be sued, as is also alleged.  EDA is not authorized to issue bonds and has no means of obtaining revenue except through annual appropriations by the Legislature.  Like any other Commonwealth agency, it must submit an annual budget to the Legislature.[27]  Although in connection with its commercial and industrial activities EDA's funds are disbursed in the manner customary in private industry,[28] from which plaintiff concludes EDA is more like a private than a governmental entity, this is only one aspect of the management of its funds.  All funds are "covered into the Treasury of Puerto Rico, and * * * deposited with recognized depositaries for the funds of the Commonwealth Government * * *.";[29] its accounting system was established by the Secretary of the Treasury, and its accounts are audited by the Controller at least once a year.[30]  EDA's property is controlled by the Secretary of the Treasury to the same extent that he usually exercises control over the property of the "regular departments and agencies of the /* * * Commonwealth,"[31] and all of its "equipment, supplies and everything necessary to carry out * * * [its] functions" are purchased by the Administrative Procurement Unit of the Treasury Department or with the approval of the Secretary of the Treasury;[32] the purchase, sale, maintenance, in fact "everything in connection with * * * [its] motor vehicles," are subject to the control and authority of the Office of Transportation of the Commonwealth Government.[33]

Notwithstanding these rather compelling factors which strongly support EDA's position that in fact it is the arm of the Commonwealth, the plaintiff contends that countervailing considerations establish that it functions as an independent agency.  The principal thrust of his argument centers about PRIDCO, which was organized in 1942 by the Puerto Rico Legislature as a public corporation to induce private capital to undertake and develop various commercial and industrial enterprises.  It was given the power to contract and to sue and be sued.  Plaintiff contends that PRIDCO had and continues to have the status of an agency entirely separate and independent of the Commonwealth; that when EDA was created in 1950 it was as the successor to PRIDCO, and as such succeeded to PRIDCO's status, emphasizing that PRIDCO itself was transferred to EDA and placed under the direction of the administrator of EDA.  It may be acknowledged that PRIDCO was entirely independent of the government of Puerto Rico and as much was conceded upon the argument of this motion.  But plaintiff's conclusion that EDA succeeded to PRIDCO's status misreads the statute which gave birth to EDA upon legislative acceptance of the Reorganization Plan of 1950, and further disregards very fundamental differences in the structure, function and powers of the two agencies and in the relationship of each to the Commonwealth.

■ EDA was created as a new "agency of the Government of Puerto Rico"[34] with a new status.  Upon its organization it did not take over lock, stock and barrel all the functions previously performed by PRIDCO, and PRIDCO itself was not legislated out of existence.  On the contrary, although subject to the control of the Economic Development Administration, PRIDCO's identity was expressly preserved as "a public corporation having legal existence and personality separate and apart from those of the Govern-

---

26. Reorganization Plan No. 10 of 1950, § 1.

27. Laws of Puerto Rico Ann. tit. 23, § 233.

28. Laws of Puerto Rico Ann. tit. 23, § 235.

29. Laws of Puerto Rico Ann. tit. 23, § 236.

30. Laws of Puerto Rico Ann. tit. 23, § 237.

31. Laws of Puerto Rico Ann. tit. 23, § 238.

32. Laws of Puerto Rico Ann. tit. 23, § 234.

33. Laws of Puerto Rico Ann. tit. 23, § 239.

34. Laws of Puerto Rico Ann. tit. 23, § 231.

ment," [35] and it retained specified functions.

PRIDCO and EDA are separate and distinct bodies, each with separate and distinct functions. Prior to EDA's creation in 1950 PRIDCO's functions embraced governmental and proprietary activities. These extended to industrial development, economic research, the promotion of tourism, and the ownership, development, operation and leasing of industrial and commercial plants. Some, but not all, of these functions were transferred to EDA. The latter took over only those of industrial development, economic research and the promotion of tourism. It is beyond serious challenge that those three functions are governmental and concern the welfare and well being of the Commonwealth and its citizens in economic, social, political and cultural aspects. On the other hand, PRIDCO continued to own, operate and manage factories; it also continued to buy, sell and lease properties—functions normally exercised by private enterprise. Since the functions which were transferred to EDA are of a nature normally associated with governmental bodies possessing sovereign immunity and particularly since the proprietary functions which would have militated against granting EDA immunity were not transferred, plaintiff's contention that EDA upon its creation automatically assumed the nonimmune, proprietary status of PRIDCO is without support.

What has been said so far as to the distinct and singular characteristics of EDA under the Act establishing it also disposes of plaintiff's further contention that because the Puerto Rico Legislature normally creates agencies independent of the Commonwealth government, EDA must be deemed such an agency. Plaintiff here points to the Puerto Rico Water Resources Authority, the Puerto Rico Ports Authority, the Metropolitan Bus Authority, the Commercial Development Company, the Puerto Rico Communications Authority and the Caribbean Economic Development Corporation. If anything, reference to them defeats rather than supports his position. Each of those agencies, like PRIDCO, but unlike EDA, is endowed by its governing statute with an entirely separate and independent status; [36] that EDA was not so endowed is indicative of a legislative purpose to differentiate between its status and those of other agencies created to function independently of the government. This purpose is underscored since the Legislature, when it desired to confer independent status upon a governmental instrumentality, knew how to do so.

In sum, the legislation under which EDA was organized establishes that it has the attributes and restrictions of a traditional executive agency of government and is far from autonomous, and further that it is without funds of its own or authority to raise funds. Were a judgment to be recovered against it, the Commonwealth would be called upon for payment. Although plaintiff in his reply memorandum argues that he does not seek a money judgment against EDA but merely equitable relief against the stock interest in the new petro-chemical complex which will be granted to PRIDCO, the fact is that his complaint names EDA and not PRIDCO as a defendant, and further his complaint seeks not only equitable relief but damages as well. If plaintiff's suit should succeed as it is presently framed, any recovery will be against EDA, and since it is without funds, payment of the judgment, if any, can only come from the Commonwealth government—a factor of much signifi-

---

35. Laws of Puerto Rico Ann. tit. 23, § 274.

36. As to the Water Resources Authority, see Laws of Puerto Rico Ann. tit. 22, § 193; as to the Ports Authority, see Laws of Puerto Rico Ann. tit. 23, § 333; as to the Bus Authority, see Laws of Puerto Rico Ann. tit. 23, § 603; as to the Commercial Development Company, see Laws of Puerto Rico Ann. tit. 23, § 251c; as to the Communications Authority, see Laws of Puerto Rico Ann. tit. 27, § 293; as to the Caribbean Economic Development Corporation, see Laws of Puerto Rico Ann. tit. 23, § 261a.

cance.[37] Moreover, it clearly appears that the Puerto Rico Legislature intended to endow EDA with the Commonwealth's sovereign immunity. This last factor alone, however, is not conclusive since a state may not clothe a body, not otherwise entitled to sovereign immunity, with such exemption from suit for the purpose of defeating diversity jurisdiction or other federal rights.[38] Thus other factors remain to be considered.

■ Plaintiff, in a further effort to bolster his position that EDA is an agency entirely independent of the Commonwealth, stresses that its methods of operation parallel those of private industry. He urges that even though EDA may not specifically be authorized by statute to enter into contracts or to sue or be sued, in fact and in practice it does enter into contracts under which it undertakes functions akin to those of private enterprise, and maintains offices in New York and other cities of the United States and Canada, where it solicits business; such activities, he contends, render EDA subject to suit. He relies heavily upon Cowles v. Mercer County,[39] where the Supreme Court said that "the power to contract with citizens of other States *implies* liability to suit by citizens of other States. * * * " [40] However, the power to contract, taken alone, is not determinative, as many courts, including the Supreme Court, have recognized.[41] Indeed the Federal Government itself possesses this power [42] and yet can only be sued with its consent.[43]

Moreover, the only instance cited by plaintiff of a contract entered into allegedly by EDA is that under which the defendant Phillips undertook the development of the petro-chemical complex, and with respect to which plaintiff now seeks a share of the profits. But EDA is not the other party to the agreement. The terms of the agreement show that the Commonwealth of Puerto Rico is the other party. After reference to the Phillips proposal for the petro-chemical com-

37. See Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945); State Highway Comm'n of Wyoming v. Utah Constr. Co., 278 U.S. 194, 199, 49 S.Ct. 104, 73 L.Ed. 262 (1929); O'Neill v. Early, 208 F.2d 286, 288 (4th Cir.1953); Cook v. Davis, 178 F.2d 595, 599 (5th Cir.), cert. denied, 340 U.S. 811, 71 S.Ct. 38, 95 L. Ed. 596 (1950); Fowler v. California Toll-Bridge Authority, 128 F.2d 549 (9th Cir.1942); Sehlmeyer v. Romeo Co., 117 F.2d 996, 998 (9th Cir.1941). Compare Miller v. State of Vermont, 201 F.Supp. 930, 932–933 (D.Vt.1962).

38. See Cowles v. Mercer County, 7 Wall. 118, 74 U.S. 118, 122, 19 L.Ed. 86 (1868); Board of Supervisors v. Ludley, 252 F.2d 372, 376 (5th Cir.), cert. denied, 358 U.S. 819, 79 S.Ct. 31, 3 L.Ed.2d 61 (1958), and cert. denied sub nom. Louisiana State Bd. of Educ. v. Lark, 358 U. S. 820, 79 S.Ct. 32, 3 L.Ed.2d 61 (1958).

39. 7 Wall. 118, 74 U.S. 118, 19 L.Ed. 86 (1868).

40. Id. at 122 (emphasis supplied).

41. This is clear from the many breach of contract actions in which the defense of sovereign immunity or absence of diversity of citizenship has been upheld. See, e. g., State Highway Comm'n of Wyoming v. Utah Constr. Co., 278 U.S. 194, 49 S. Ct. 104, 73 L.Ed. 262 (1929); Harrison Constr. Co. v. Ohio Turnpike Comm'n, 272 F.2d 337 (6th Cir.1959); O'Neill v. Early, 208 F.2d 286 (4th Cir.1953); North Dakota v. National Milling & Cereal Co., 114 F.2d 777 (8th Cir.1940); DeLong Corp. v. Oregon State Highway Comm'n, 233 F.Supp. 7 (D.Ore.1964), aff'd, 343 F.2d 911 (9th Cir.), cert. denied, 382 U.S. 877, 86 S.Ct. 161, 15 L.Ed. 2d 119 (1965).

42. See Rex Trailer Co. v. United States, 350 U.S. 148, 151, 76 S.Ct. 219, 100 L.Ed. 149 (1956); Atlantic Mut. Ins. Co. v. Cooney, 303 F.2d 253, 259 (9th Cir. 1962); Shepard Eng'r Co. v. United States, 289 F.2d 681, 682 (8th Cir.1961); Matter of American Boiler Works, Inc., 220 F.2d 319, 321 (3d Cir.1955); United States v. Salon, 182 F.2d 110, 111–112 (7th Cir.1950).

43. See Maricopa County v. Valley Nat'l Bank, 318 U.S. 357, 362, 63 S.Ct. 587, 87 L.Ed. 834 (1943); State of Minnesota v. United States, 305 U.S. 382, 387, 59 S.Ct. 292, 83 L.Ed. 235 (1939); Schillinger v. United States, 155 U.S. 163, 166, 15 S. Ct. 85, 39 L.Ed. 108 (1894); North Atlantic & Gulf S. S. Co. v. United States, 209 F.2d 487, 489 (2d Cir.1954).

plex, the agreement recites, "It is the objective of the Government of the Commonwealth of Puerto Rico and of Phillips Petroleum Co. to implement the proposal described above as promptly as possible." And another section provides that in the event of Phillips' breach of essential provisions, "the Commonwealth may" take certain action as specified. Although the agreement is signed by the administrator of EDA, it is also signed and approved by the governor of Puerto Rico. The obligations thereunder are those of the Commonwealth; indeed the contract contains a section headed: "Additional Obligations of the Commonwealth." The Commonwealth's commitment, in part, is to grant maximum tax exemption, to participate in the financing and to give support to an oil import allocation by the Department of Interior. In addition, the Commonwealth commitment extends to assurance of cooperation by EDA in obtaining necessary licenses, manpower and electric power. The governmental obligation, so clearly defined in this agreement, and the Commonwealth's right in the event of breach, negate plaintiff's claim that EDA is the party in interest.

■■■■ Equally unavailing is the plaintiff's position with respect to the maintenance of offices by EDA in the United States and Canada. Its activities there are promotional and informational and intended to publicize industrial and economic opportunities in Puerto Rico. Its representatives answer inquiries from prospective investors, analyze proposed projects and advise as to their eligibility for tax exemption under the Commonwealth's industrial and economic program. It is not uncommon, and indeed the court may take judicial notice, that states and governments advertise and publicize investment availability, scenic beauty and vacation attractions [44] in an effort to advance their economy and thus promote their general welfare. That EDA performs these functions outside of Puerto Rico does not mean that it sheds its governmental character.

■■■■ Considering the nature of the plaintiff's claim, which clearly required a commitment by the Commonwealth of Puerto Rico, the structure, functions and powers of EDA, as defined by the statute which implemented Reorganization Plan No. 10, and EDA's operations, the court is persuaded that under the circumstances here presented EDA was acting as the agency and alter ego of the Commonwealth and that the Commonwealth is the real party in interest; accordingly, the defendant's motion under Rule 12(b) (1) to dismiss for lack of jurisdiction over the subject matter based upon nondiversity of citizenship is granted. This disposition makes it unnecessary to consider defendant's further motions under other subsections of Rule 12, as well as its motion for summary judgment.

II

Phillips' motion for summary judgment presents different issues from those involved in the disposition of Commonwealth's motion to dismiss for lack of jurisdiction, and so reference is necessary to other matters relating to plaintiff's claim.

Plaintiff is an attorney practicing law in New York City more than thirty years, who since 1942 has had some professional and social contacts in Puerto Rico. Up to

44. See, e.g., N.Y. Times, June 19, 1966, § 6 (Magazine), p. 80 (advertisement placed by Bahamas Ministry of Tourism); N.Y. Times, May 8, 1966, § 6 (Magazine), p. 74 (advertisement placed by Oregon Highway Department); The New Yorker, May 21, 1966, p. 190 (advertisement placed by Arkansas Industrial Development Commission); id. at 150 (advertisement placed by Nova Scotia Travel Bureau); The New Yorker, May 14, 1966, p. 83 (advertisement placed by Virginia Department of Conservation and Economic Development); The New Yorker, May 7, 1966, p. 155 (advertisement placed by Quebec Tourist Branch); The New Yorker, April 16, 1966, p. 97 (advertisement placed by U. S. Virgin Islands Government Information Center); id. at 38–39 (advertisement placed by Government of Ontario Department of Economics and Development); Punch, Feb. 9, 1966, p. xi (advertisement placed by United States Travel Service).

early May 1961, as he acknowledged upon his deposition, he was unaware of the 1959 Presidential proclamation which restricted oil importation into the United States and Puerto Rico. It first came to his notice when a member of Cirillo Brothers, clients whose corporate enterprises plaintiff represented in admiralty matters, commented upon the difficulty he had experienced in his efforts to obtain an oil import quota license for an affiliated oil and fuel company. Plaintiff then and there checked the regulations and statute and ascertained that Puerto Rico was a separate district for oil control. He suggested to his client, whose principal interest was in securing a source of fuel oil, that it could be derived as a by-product or surplus of the petroleum feed stock required for an oil refinery and petro-chemical complex. Thus the proposal for a petro-chemical complex had its origin. Plaintiff was of the view that the quota license for the petroleum feed stock for such a project could be secured with the support of the Puerto Rican Government and its officials, a matter hereafter adverted to in greater detail since it represents the hard core of plaintiff's claims under the various theories advanced by him.

Soon after his initial talk with his client[45] plaintiff enlisted the aid of two friends in Puerto Rico to contact Puerto Rican officials in the office of EDA. One was Jose Feliciano; the other was Abraham Nieves, a director of a bank in Puerto Rico, who plaintiff understood was a close friend of Rafael Durand, the head of EDA.

Feliciano, who appears initially to have been uncertain as to whom in authority to contact in Fomento, as EDA was known in Puerto Rico, finally reached Durand and wrote to plaintiff on June 6 that Durand doubted the "Governor will * * * approve any participation of any governmental agency in any other application for increase in quota" because the Commonwealth had previously supported an application for a 20,000 barrel a day increase which had been granted upon condition that no further increase would be applied for. In the same letter Feliciano also conveyed Durand's suggestions that plaintiff file an application for a quota directly with the U. S. Secretary of Interior to see what he could accomplish on his own, and that he write Durand "a letter stating your problem and asking for the cooperation of the Commonwealth Government on this matter."[46] Finally, Feliciano urged that plaintiff present his program to EDA's representatives in New York.

Plaintiff never followed through on the suggestion that he file an application directly nor did he immediately write Durand. However, during the week of June 19 he did confer at EDA's New York City office with representatives there, Diaz Hernandez and a Mr. Hiquera. Plaintiff testified that he endeavored to "sell" his proposal for a petro-chemical complex and to convince them of its value to Puerto Rico; however, as he further acknowledged, those two gentlemen just listened and all they undertook to do was to talk to Durand about the project. As events developed, Hernandez later wrote to EDA in Puerto Rico that while he agreed with the idea of a third refinery, "the Government should not give backing to any specific project at this stage." His view, concurred in by Durand, was that "it would be impracticable for the Commonwealth Government to back the Krisel project at this early stage."

The only other occasion plaintiff personally met with any EDA representative was on or about July 3, 1961 when together with two members of the Cirillo Brothers firm he conferred at the EDA office in Puerto Rico with Sam J. Van

45. Plaintiff and his clients entered into a joint venture for the development of an oil refinery and related petro-chemical industry in Puerto Rico which was formalized by written agreement in July 1961.

46. Plaintiff interprets this statement as an express invitation by EDA to submit his plan for a petro-chemical complex.

Hyning, economic consultant for EDA, to whom they were introduced by Feliciano and Max Goldman, an attorney practicing in Puerto Rico. Plaintiff upon his deposition testified that in essence he repeated the same speech he had made several weeks before to Hernandez and Hiquera in New York but that Van Hyning was "somewhat argumentative about * * * [his] proposals with respect to this complex," and expressed the view that "it would be difficult to get a quota of 50,-000 barrels a day. * * * " In any event, Van Hyning like the New York EDA representatives, deferred to Durand, with whom he said he would take up the matter.

It is evident from subsequent correspondence and other documentary matter that Van Hyning was "cold" and unenthusiastic about plaintiff's proposal and doubted the financial capacity of plaintiff and his associates to carry through the proposed project. For a variety of reasons, he was generally of the view that in connection with any third refinery, a daily import quota of 5–15,000 barrels rather than 50,000 barrels reflected a more realistic approach. Plaintiff on the other hand kept urging Feliciano to impress upon EDA officials a program which, based upon his client's needs for residual fuel oil, called for not less than 35–40,000 barrels a day in the initial stages of the project and later for 70,000 barrels a day.

On September 26,[47] Van Hyning wrote to plaintiff that among other matters he could "offer * * * no encouragement whatever concerning the petroleum refinery project. * * * I would not recommend that the Commonwealth Government request a crude oil import quota increase of 70,000 barrels/day."

Plaintiff never met Durand personally. But against the general background of these previous events and inter-party correspondence, plaintiff submitted to Durand a formal proposal dated September 25, 1961, which was either personally delivered or mailed to him on September 28 by Nieves.[48] Insofar as here relevant it states:

" * * * [W]e are conveying to you hereby our program for the development of an industrial complex in Puerto Rico predicated on your Government issuing to our enterprise a commitment that:

"1. The Commonwealth government will obtain a quota of foreign crude oil, preferably Venezuelan, for our use sufficient in barrelage per day to warrant our going ahead with our plans.

* * * * * *

"C). *The Oil Refinery*

"We contemplate erecting a plant with a capacity for processing, ultimately, 70,000 barrels of Crude Oil per day. To begin with, for the first 2–3 years, at least 35–40,000 barrels per day should be put through this refinery if we are to develop some of the industries hereinafter set forth, which will be based on the petroleum derivatives."

On October 16, Durand advised the plaintiff that the "Commonwealth of Puerto Rico will not entertain a commitment to satisfy the first condition stated in your letter of September 25 to me."

As noted in the discussion under the Commonwealth motion, the Phillips Petroleum Company in January 1964, with Commonwealth support, filed application for a 50,000 barrel per day quota of selected feed stock to be imported into Puerto Rico for refinement and use in a proposed petro-chemical complex. The successive and intermediate steps, which preceded the final contract in May 1965 between Phillips and the Commonwealth

47. This letter appears to have been forwarded before plaintiff's letter of September 25 was delivered to Durand on September 28.

48. Plaintiff had sent the proposal on to Nieves with a request that it be hand delivered to Durand. Nieves in his affidavit states he mailed the letter, but plaintiff refers to a communication from Nieves which plaintiff suggests shows the letter was hand delivered.

for the construction of the project, following final approval by the Department of Interior, have also been referred to.

Plaintiff had no dealings with Phillips; his sole contact was the claim letter he sent in February 1965, followed by this law suit commenced in September 1965. His claims against Phillips are hinged to those asserted against EDA, the merits of which were not reached in the EDA motion. They must necessarily be analyzed on the defendant Phillips' cross motion for summary judgment.

Plaintiff's basic claim, however elaborated, is that his proposal for a petrochemical complex was novel, unique and original; that it was disclosed by him and by Feliciano and Nieves acting on his behalf to EDA and its officials, Durand and Van Hyning in Puerto Rico and Hernandez and Hiquera in New York

City, in trust and confidence and upon EDA's and its officials' agreement that the plan would not be revealed; that contrary thereto EDA and its officials disclosed the plan to Phillips, with whom it thereafter entered into an agreement for the development of the complex; that EDA, its officials, and Phillips, the latter with notice of plaintiff's rights and his relation to EDA, appropriated his idea and property.

Plaintiff's separate causes of action against EDA for damages and equitable relief, as variously denominated by him, are for (1) breach of contract, either (a) express,[49] (b) implied in fact [50] or (c) implied in law,[51] (2) breach of trust and confidential relationship [52] and (3) misappropriation of property.[53] As to Phillips, the causes of action asserted are that it knowingly participated in and induced a breach of (1) the contract not to dis-

**49.** See Bristol v. Equitable Life Assur. Soc'y, 132 N.Y. 264, 267, 30 N.E. 506 (1892); Cole v. Phillips H. Lord, Inc., 262 App.Div. 116, 28 N.Y.S.2d 404, 409 (1st Dep't 1941); Anderson v. Distler, 173 Misc. 261, 17 N.Y.S.2d 674, 678 (Sup. Ct.1940).

**50.** See Official Airlines Schedule Information Serv. Inc. v. Eastern Air Lines, Inc., 333 F.2d 672, 675 (5th Cir.1964) (concurring opinion); Robbins v. Frank Cooper Assocs., 14 N.Y.2d 913, 252 N. Y.S.2d 318, 200 N.E.2d 860 (1964), reversing 19 App.Div.2d 242, 241 N.Y.S.2d 259, 261 (1st Dep't 1963). Cf. La Varre v. Warner Bros. Pictures, Inc., 282 N.Y. 68, 24 N.E.2d 850 (1939).

**51.** See Grombach Prods., Inc. v. Waring, 293 N.Y. 609, 615, 59 N.E.2d 425 (1944); Robbins v. Frank Cooper Assocs., 19 App.Div.2d 242, 241 N.Y.S.2d 259, 261 (1st Dep't 1963), rev'd on other grounds, 14 N.Y.2d 913, 252 N.Y.S.2d 318, 200 N. E.2d 860 (1964); Carneval v. William Morris Agency, Inc., 124 N.Y.S.2d 319, 320 (Sup.Ct.1953), aff'd, 284 App.Div. 1041, 137 N.Y.S.2d 612 (1st Dep't 1954).

**52.** See Matarese v. Moore-McCormack Lines, Inc., 158 F.2d 631, 634–635 (2d Cir. 1946). The cause of action for breach of trust and confidential relationship is not in fact a separate and distinct one but is merely a different denomination for the cause of action upon an implied in law contract. See Robbins v. Frank Cooper Assocs., 19 A.D.2d 242, 241 N.Y.

S.2d 259, 261 (1st Dep't 1963), rev'd on other grounds, 14 N.Y.2d 913, 252 N.Y.S. 2d 318, 200 N.E.2d 860 (1964).

**53.** See Flexitized, Inc. v. National Flexitized Corp., 335 F.2d 774, 781 (2d Cir. 1964), cert. denied, 380 U.S. 913, 85 S. Ct. 899, 13 L.Ed.2d 799 (1965); Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F.2d 569, 572 (2d Cir.1959), cert. denied, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960); Miller v. Universal Pictures Co., 18 Misc.2d 626, 188 N. Y.S.2d 386, 393 (Sup.Ct.1959), rev'd on other grounds, 11 A.D.2d 47, 201 N.Y.S. 2d 632 (1st Dep't 1960), aff'd, 10 N.Y. 2d 972, 224 N.Y.S.2d 662, 180 N.E.2d 248 (1961); Dior, S. A. R. L. v. Milton, 9 Misc.2d 425, 155 N.Y.S.2d 443, 455–456 (Sup.Ct.), aff'd, 2 A.D.2d 878, 156 N.Y. S.2d 996 (1st Dep't 1956). Despite language in the cases cited discussing property rights, that the New York courts would accord protection to an idea or program in the absence of either a contractual, confidential or other fiduciary relationship is not altogether clear. See Norwich Pharmacal Co. v. Sterling Drug, Inc., supra, 271 F.2d at 572 n. 6; Galanis v. Procter & Gamble Corp., 153 F.Supp. 34, 37 (S.D.N.Y.1957); O'Brien v. RKO Radio Pictures, Inc., 68 F.Supp. 13, 14 (S.D.N.Y.1946); Grombach Prods., Inc. v. Waring, 293 N.Y. 609, 616, 59 N.E.2d 425 (1944); Bristol v. Equitable Life Assur. Soc'y, 132 N.Y. 264, 267, 30 N.E. 506 (1892).

close,[54] (2) the relationship of trust and confidence between plaintiff and EDA,[55] and (3) that it misappropriated plaintiff's property.[56] In his supplemental brief, plaintiff states that the program allegedly misappropriated by Phillips was "a property right which is subject to the usual rules of property, and entitled as such to the protection of law".

Plaintiff's program, according to him, was "finalized" and put into concrete form in his letter dated September 25, 1961. He himself summarizes the five important elements of his program as outlined in that letter as follows:

"(1) the petrochemical complex with its economic and employment aspects for the particular benefit of Puerto Rico;

"(2) the importation of cheap crude * * * oil by low cost water transportation from Venezuela which made it economically attractive;

"(3) tax exemption by the Commonwealth of Puerto Rico;

"(4) participation in the investments by Puerto Rico and its people; and

"(5) *most important of all*, a means of importing the necessary oil—a means of opening the quota door —by the use of political prestige, power, and leverage of Puerto Rico and its economic needs." (Emphasis supplied)

This last item—the use of the political prestige and power in support of the quota application—is the hard core of his claim of an original idea and property right. He acknowledges, although grudgingly, that concepts of a petro-chemical complex, the importation of oil feed stock, tax exemption, and investment in projects by the Puerto Rican public, were within the knowledge and experience of Puerto Rican and EDA authorities in furtherance of "Operation Bootstrap." But plaintiff contends these separate concepts were, to use his language, "the expression of disconnected, generalized ideas which may have been before EDA in the past," until he conceived "a practical integration of ideas into a homogeneous, concrete and definite program. This was and is the real uniqueness of my program—for the first time it was all in one package ready to use."

Plaintiff repeatedly, in one way or another in his affidavit in opposition to the motion for summary judgment, in his deposition and in his several briefs emphasizes that the "valuable idea, plan and program" allegedly entrusted to EDA in confidence and appropriated by Phillips was the concept of using the political power and governmental prestige to secure the daily barrelage necessary for the contemplated project. He summed it up in his deposition, when he characterized the condition in his letter of September 25, that the Commonwealth commit itself to obtaining a foreign quota of crude oil "as the foundation stone of the entire program," and added, "my whole object was to utilize the position of the Puerto Rican governor, Munoz-Marin, and the Puerto Rican government's economic program * * * its prestige. * * *"

Phillips not only urges that plaintiff's claims against EDA are without foundation, but further presses that his claim of novelty,. upon its face, is so utterly lack-

54. See Phillips v. Belding Heminway Co., 50 F.Supp. 1015, 1019 (S.D.N.Y.1943); Hornstein v. Podwitz, 254 N.Y. 443, 448, 173 N.E. 674, 84 A.L.R. 1 (1930); Lamb v. S. Cheney & Son, 227 N.Y. 418, 125 N.E. 817 (1920).

55. See Jackson v. Smith, 254 U.S. 586, 589, 41 S.Ct. 200, 65 L.Ed. 418 (1921); Irving Trust Co. v. Deutsch, 73 F.2d 121, 125 (2d Cir.1934), cert. denied sub nom. Irving Trust Co. v. Bankers Trust Co., 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243 (1935).

56. Cf. Damis v. Barcia, 266 App.Div. 698, 40 N.Y.S.2d 107 (3d Dep't 1943), overruled on other grounds, Stanton Motor Corp. v. Rosetti, 11 App.Div.2d 296, 203 N.Y.S.2d 273 (3d Dep't 1960); Phelps v. McQuade, 158 App.Div. 528, 143 N.Y.S. 822 (1st Dep't 1913), aff'd, 220 N.Y. 232, 115 N.E. 441, L.R.A.1918B, 973 (1917); Ross v. Leuci, 194 Misc. 345, 85 N.Y.S.2d 497, 501 (N.Y.City Ct.1949).

ing in substance that it presents no issue of fact. It also argues that an essential ingredient of each of plaintiff's causes of action, no matter what theory is advanced, is novelty and since it is lacking, all his claims must fall.

In resisting the motion, plaintiff contends that his claim of novelty presents an issue of fact which alone requires its denial. He further argues that even if it be held upon the undisputed facts that his program is not novel, nonetheless, factual issues remain as to (1) the relationship of trust and confidence between him and EDA, (2) the existence of an agreement, whether express or implied in fact or in law, that the program would not be disclosed to third parties, and (3) whether Phillips, aware of plaintiff's alleged trust and contractual relationship with EDA, misappropriated his property; that these issues likewise require denial of the summary judgment motion. In any event, he contends he should not be foreclosed from an opportunity to depose Feliciano and Nieves, who, in affidavits submitted on this motion, have denied the bases of his various causes of action.[57]

In this diversity action, the initial question is what substantive law the courts of New York would apply in determining the validity of plaintiff's claim. Both New York and Puerto Rico had substantial contacts with the matter in dispute, but the parties at a conference with the Court agreed that New York law governs, particularly so in the absence of authoritative holdings by the Puerto Rican courts on the issues here presented.[58]

■■■■ The Court does not reach the issue of novelty on which the parties have concentrated much of their respective arguments. Contrary to the defendant's contention, a determination favorable to it on the novelty question would not dispose of all of plaintiff's theories of recovery. Plaintiff asserts that his program was entrusted to EDA upon an express agreement that it would not be disclosed and would be treated in confidence. Under New York law, an idea, if valuable, even though it does not contain novel, secret or confidential material, may be protected by such an agreement. This doctrine applies even when the subject matter of the idea is common or open to public knowledge.[59]

■■■■ It is of course true that the mere assertion of a claim is not by itself sufficient to ward off summary judg-

57. Durand and Van Hyning have also submitted affidavits categorically denying the essentials of plaintiff's claims.

58. See Walton v. Arabian American Oil Co., 233 F.2d 541, 545–546 (2d Cir.), cert. denied, 352 U.S. 872, 77 S.Ct. 97, 1 L.Ed.2d 77 (1956); Gaines v. Jacobsen, 308 N.Y. 218, 221–222, 124 N.E.2d 290, 48 A.L.R.2d 312 (1954); Aghnides v. Aghnides, 159 N.Y.S.2d 343, 347 (Sup. Ct.), aff'd, 4 A.D.2d 498, 167 N.Y.S.2d 201 (1st Dep't 1957).

59. See Bristol v. Equitable Life Assur. Soc'y, 132 N.Y. 264, 267, 30 N.E. 506 (1892); Miller v. Universal Pictures Co., 11 A.D.2d 47, 201 N.Y.S.2d 632, 634–635 (1st Dep't 1960), aff'd, 10 N.Y.2d 972, 224 N.Y.S.2d 662, 180 N.E.2d 248 (1961); Cole v. Phillips H. Lord, Inc., 262 App. Div. 116, 28 N.Y.S.2d 404, 409 (1st Dep't 1941); High v. Trade Union Courier Publishing Corp., 31 Misc.2d 7, 69 N.Y.S. 2d 526, 529 (Sup.Ct.1946), aff'd, 275 App. Div. 803, 89 N.Y.S.2d 527 (1st. Dep't 1949). See also Miller v. Universal Pictures Co., 10 N.Y.2d 972, 973, 976–977, 224 N.Y.S.2d 662, 665, 180 N.E.2d 248, 250 (1961) (dissenting opinion), where it is said: "The fundamental law is that where there is an agreement * * * the parties to the contract must remain faithful to its terms whether or not the disclosure is novel or original. * * * There is nothing unreasonable in the assumption that a producer would obligate himself to pay for the disclosure of an idea * * * *which in fact, he would be unable to use but for the disclosure.* * * * The test for a property right, applied in common law copyright cases, is that the work be new, novel and in concrete form. * * * [T]his property right test not a part of any traditional contract action * * *. The reason for the requirement in common law copyright was that to have a remedy good against the world, a property right must be shown. *This reason for the test is missing in an action on a contract.*'"

ment.[60] Generally a party is entitled to a trial only if he "set[s] forth specific facts showing that there is a genuine issue for trial," [61] and plaintiff in neither his affidavit nor his deposition has set forth sufficient facts to support an express contract of non-disclosure or confidentiality of his program. His deposition testimony as to his only two direct contacts with EDA officials, with Hernandez and Hiquera in New York and Van Hyning in Puerto Rico, reflects that these men neither made any commitments to plaintiff nor were requested to make any. The sum total of their meetings was that the officials stated that the matter would be taken up with Durand. Plaintiff, when asked, "Did * * * [Hernandez and Hiquera] undertake not to talk with anyone about your project," responded, "I don't recall they undertook to do anything except to talk to Mr. Duran about this project." As to his talk with Van Hyning, plaintiff testified that the latter only "said he would take it up with Mr. Duran, the entire project"; when specifically pressed whether Van Hyning made any undertaking to him, plaintiff said, " * * * I don't understand—'undertaking' to me means did he make a contract. Did he make a contract with me? The answer is 'No.' * * * He undertook to take the matter up with Mr. Duran."

Plaintiff claims however, that his program was entrusted by him in confidence to Feliciano and Nieves, who acted on his behalf in their discussions with and presentation of the matter to Durand and other EDA officials and that an express agreement of non-disclosure resulted. He also emphasizes that his letter of September 25, 1961

not only was marked "confidential" but under his instructions to Nieves was to be delivered personally by the latter to Durand. Both Feliciano and Nieves, contrary to plaintiff's contention, deny that the proposal or any information with respect thereto was ever submitted by them to Durand or Feliciano or any EDA officials upon any agreement or understanding of non-disclosure or non-use of the information. Seemingly, this should end this aspect of the matter. But plaintiff challenges the denials of his erstwhile friends, who, he asserts, are now hostile witnesses who have yielded to local influences and urges that a pre-trial examination of them and those EDA representatives with whom they conferred on his behalf will establish, contrary to their present positions, that an express agreement was made.

In the circumstances, however tenuous plaintiff's claim may appear, he should be afforded an opportunity to depose those he alleges have betrayed his interest. They and the Puerto Rican officials with whom they met on plaintiff's behalf have exclusive knowledge of the events upon which plaintiff's claim of an express contract must rest. Under the circumstances, Rule 56(f) requires that plaintiff be given an opportunity to inquire into these events.[62] Accordingly, the motion by Phillips for summary judgment is denied but without prejudice to renewal upon completion of the depositions.

### III

There remains for final consideration the plaintiff's motions addressed to the defense of laches and

60. See Dressler v. The MV Sandpiper, 331 F.2d 130, 132 (2d Cir.1964) ; Peter Pan Fabrics, Inc. v. Dixon Textile Corp., 280 F.2d 800, 804 (2d Cir.1960); Engl v. Aetna Life Ins. Co., 139 F.2d 469, 473 (2d Cir.1943).

61. Fed.R.Civ.P. 56(e). Accord, Dressler v. The MV Sandpiper, 331 F.2d 130, 133 (2d Cir.1964).

62. See Dombrovskis v. Esperdy, 185 F. Supp. 478, 484 (S.D.N.Y.1960), aff'd, 321 F.2d 463 (2d Cir.1963); Peckham v. Ronrico Corp., 7 F.R.D. 324, 330–331 (D.P.R.1947), rev'd on other grounds, 171 F.2d 653 (1st Cir.1948); Shultz v. Manufacturers & Traders Trust Co., 32 F.Supp. 120, 121 (W.D.N.Y.1940). See Generally 6 Moore, Federal Practice ¶ 56.24 (2d ed. 1965).

also to the separate defense that the complaint fails to state a claim upon which relief may be granted. There is no basis for granting these motions at this time,[63] and they are denied.

---

63. As to the defense of laches, an issue of fact is presented. See Oil & Gas Ventures—First 1958 Fund, Ltd. v. Kung, 250 F.Supp. 744, 753 (S.D.N.Y.1966); Haine v. Googe, 248 F.Supp. 349, 352 (S.D.N.Y.1965); Dictograph Prods. Co. v. Sonotone Corp., 95 F.Supp. 126, 127 (S.D.N.Y.1951); Greenspon v. Parke, Davis & Co., 8 F.R.D. 485 (S.D.N.Y. 1948). See generally 3 Barron & Holtzoff, Federal Practice & Procedure § 1245, at 208 (Wright ed. 1958) (" [T]he defense of laches generally raises issues of fact. * * *"). As to the defense of failure to state a claim, plaintiff's motions raise essentially the same issue as Phillips' cross-motion for summary judgment—the substantive merits of plaintiff's claim for relief. Cf. Lehmann Trading Corp. v. J & H Stolow, Inc., 184 F. Supp. 21, 22 (S.D.N.Y.1960). Since this question is yet to be passed upon, no purpose would be served by now striking the defense. A motion to strike a defense will be denied where, as here, there are questions of fact to be determined. See Moriarty v. Curran, 18 F.R.D. 461, 462 (S.D.N.Y.1956) ; Hill Brown Corp. v. Bosler, 14 F.R.D. 170, 172 (D.R.I.1953); Reid v. Doubleday & Co., 109 F.Supp. 354, 357 (N.D.Ohio 1952).